THE NARRAGANSETT INDIANS.

PROVIDENCE—FEBRUARY 24, 1898.

PRESENT: Matteson, C. J., Stiness, Tillinghast, Wilbur, Rogers, Douglas, and Bosworth, JJ.

The ultimate title to the soil of the tribal lands, subject to the Indian possessory title, was in the crown by right of discovery ; the charter of 1663 granted to the colony of Rhode Island jurisdictional powers of government, and the soil subject to the Indian title ; the State has succeeded to the rights of the colony and of the crown.

The Indian title, or the right to convey these lands, was formerly in the sachem ; then in the sachem and council ; and finally in the council of the tribe, not for its own use merely but for the benefit of the tribe.

The political officers of the United States seem never to have recognized the existence of such a tribe as the Narragansett ; and hence these Indians are not a tribe with which Congress, by the constitution of the United States, is empowered to regulate commerce.

The State of Rhode Island has, however, recognized them as a tribe or com-

munity possessing interest and title in and to their tribal lands worthy of compensation when parted with constitutionally.

The Narragansett tribe was not a corporation, or quasi corporation, with vested rights in the immunities granted them by the General Assembly.

And the State was guardian of the tribe only in a general, and not in a technical sense; as it is the guardian or protector of all within its jurisdiction.

Ninigret's deed of 1709 had passed title to all the tribal lands excepting the reservation.

Chapter 800, as amended by chapter 897 of the Public Laws of Rhode Island, provided a constitutional method by which they could transfer to the State their title and interest in and to their remaining tribal lands.

The council of the Narragansett tribe could sell, and give title to and possession of, these lands, and it has legally and constitutionally done so by its deed under the acts of the General Assembly mentioned.

That title and interest so acquired, combined with the title the State already had, make a full and valid title which the State may sell under said chapters, and thereby give to the purchasers thereof a like full and valid title to said lands.

The disposition of the purchase money under said chapters 800 and 897 was an equitable proceeding, and the analogies of a trust are applicable thereto; these acts are not, therefore, unconstitutional in not providing for a jury trial.

The words "all other rights and claims of whatever name and nature," used in said chapters, applied only to property rights and claims; for all immunities enjoyed by previous statutes were taken away by the repeal of those statutes.

For thirty years before the passage of chapter 800 the Narragansett tribe had become extinct in all but name; the people calling themselves Narragansetts are only a decayed remnant of the once tributary tribe of the Niantics.

The tribal relations of the members of the so-called Narragansett tribe were constitutionally terminated by the above-mentioned acts.

(This opinion was prepared by Mr. Justice Rogers.)

*To the Honorable the Senate of the State of Rhode Island and Providence Plantations :*

We have received from your honorable body a resolution requesting our opinion on the following questions, to wit :

I.   Are the provisions of chapter 800 of the Public Laws of Rhode Island, passed March 31st, 1880, constitutional?

2.   Do the quitclaim deeds, executed and delivered by the Council of the Narragansett tribe of Indians, or by a majority of them, of their common tribal lands, and of their tribal rights and claims, to commissioners, under and in accordance with the provisions of section 2 of chapter 800 of the. Public Laws of Rhode Island, passed March 31st, 1880, vest in the State of Rhode Island the right, title, interest, and

property of said tribe in and to the premises so quitclaimed and deeded as aforesaid?

3.   Has the State of Rhode Island acquired, or can said State acquire, any valid title or interest in the tribal lands of the Narragansett tribe of Indians by any proceedings under the provisions of chapter 800 of the Public Laws of Rhode Island, passed March 31st, 1880?

4.   Are the tribal relations, and tribal authority of the Narragansett tribe of Indians abolished by the provisions of chapter 800· of the Public Laws of Rhode Island, passed March 31st, 1880?

5.   Have persons who have taken conveyances from the State under act of 1880, chapter 800, acquired a valid title to lands conveyed?

To answer these questions adequately, with the reasons upon which our opinion. is based, requires an examination of the relations existing between this State, including the Royal Colony preceding it, and the Narragansett tribe of Indians, from the earliest settlement of the colony down to the passage of the act in question.

It will be necessary to consider what the tenure of Indian land was, not only according to the law of England, which we inherited, but also as between the Indians themselves, as we find constant reference, even down to 1880, as well by the Narragansetts as by our own General Assembly, to the Narragansett tenure of land according to ancient usage and tradition; hence it will be needful to inquire into the early manners and customs of the Narragansetts to ascertain how they themselves dealt with their land.   In tracing the title of the Narragansett lands during the two hundred and forty-four years extending from 1636, the date of the settlement of the colony, to 1880, the date of the passage of the act, two considerations must receive especial attention, the first being the effect of a deed containing an exception, or reservation, of certain territory embracing the land referred to in said cap. 800 as tribal lands, dated March 28th, 1709, and made by Ninigret, the sachem of the Narragansetts, to the colony of Rhode Island.   A glance at some of the events preceding

the making of that deed will be necessary to a proper understanding of the circumstances under which it was made. The second consideration is—what effect, if any, did Rhode Island's adoption of the federal constitution, in 1790, have upon the relations of the State with the Narragansett tribe ?

The first reference to the Narragansetts that we glean from history is early in July, 1621, the year after the Pilgrims landed on Plymouth Rock, when a returning scouting party reported to the Plymouth Colony the existence of the Narragansetts, a people strong and many in numbers, living compactly together, that had not at all been touched by the wasting pestilence which had devastated the Indians of New England a few years before the arrival of the English, and located on the other side of the great bay from Massasoit and his tribe of Wampanoags.   Roger Williams says in his Key that the Narragansetts were the chief people in the land. Gov. Hutchinson states that they were the most numerous of all the tribes between Boston and the Hudson river. Brinley's assertion is that they formerly numbered thirty thousand; while Callender declares that at the beginning of King Philip's war, in the spring of 1675, they were reputed to have four thousand fighting men.   This latter writer, in his Century Discourse delivered at Newport in 1738, after describing the Great Swamp Fight between the troops of the United Colonies and the Narragansetts in December, 1675, which he designates as "the greatest action ever performed by the New English Colonies against the Indians, if we regard either the numbers of men on each side, or the consequences of the action," says:   " The Indians were soon pursued with famine and sickness, so that after they submitted the next year, they were never formidable again."   Then he proceeds as follows:   " These Narragansetts do now, in a manner, cease to be a people, the few, if any, remaining in the Colony, being either scattered about where the English will employ them, or sheltered under the successors of Ninigret, a sachem that refused to join in the war, and so has preserved his lands to his posterity; and there are a few Indians now living round him, on his lands, or belonging to his tribe."   The

people in Rhode Island in our day calling themselves Narragansetts are, properly speaking, not Narragansetts at all; but, at best, only a decayed remnant of the Niantics, a tribe tributary to the Narragansetts, with whom the survivors of the latter took refuge after the Great Swamp Fight; the less celebrated tribe adopting and being known thenceforward by the more famous name of their once-powerful neighbors, the Narragansetts.

The government, language, manners, and customs of the Indians on the New England sea coast were very similar. Roger Williams, in his Key, writing solely of the Narragansetts, says: "Their government is monarchicall. . . . . Beside their generall subjection to the highest Sachims, to whom they carry presents, they have also particular Protectors, under Sachims, to whom they also carry presents, and upon any injury received and complaint made, these Protectors will revenge it. . . . . . The Sachims, although they have an absolute Monarchie over the people; yet they will not conclude of ought that concernes all, either Lawes, or Subsidies, or Warres, unto which the people are averse, and by gentle perswasion cannot be brought." Governor Winslow, of Plymouth Colony, in writing about the Indians of Southern New England [Morton's N. E. Memorial, Ap. 489], tells us: "Their Sachems cannot all be called kings, but only some few of them, to whom the rest resort for protection and pay homage unto them; neither may they war without their knowledge and approbation; yet to be commanded by the greater, as occasion seemeth. Of this sort is Massasoit, our friend, and Canonicus of Narragansett, our supposed enemy. Every Sachem taketh care of the widow and fatherless, also for such as are aged and any way maimed, if their friends be dead, or not able to provide for them. . . . . This government is successive and not by choice; if the father die before the son or daughter be of age, then the child is committed to the protection and tuition of some one amongst them, who ruleth in his stead till he be of age, but when that is I know not. Every sachem knoweth how far the bounds and limits of his own country extendeth,

and that is his own proper inheritance; out of that, if any of his men desire land to set their corn, he giveth them as much as they can use, and sets them in their bounds. . . . . As for their language, it is very copious, large, and difficult, as yet we cannot attain to any great measure thereof; but can understand them, and explain ourselves to their understanding,. by the help of those that daily converse with us. And though there be difference in an hundred miles distance of place, both in language and manners, yet not so much but that they very well understand each other." Captain Gookin, another contemporary of Roger Williams, in his Historical Collections of the Indians in New England [Mass. Hist. Soc. Col., Ser. 1, Vol. 1, p. 141, 154], writes: "Their government is generally monarchical, their chief sachem or sagamore's will being their law; but yet the sachem hath some chief men that he consults with as his special counsellors. Among some of the Indians their government is mixed, partly monarchical, and partly aristocratical; their sagamore doing not any weighty matter without the consent of his great men, or petty sagamores. Their sachems have not their men in such subjection, but that very frequently their men will leave them upon distaste or harsh dealing, and go and live under other sachems that can protect them : so that their princes endeavour to carry it obligingly and lovingly unto their people, lest they should desert them, and thereby their strength, power, and tribute would be diminished."

Until the discovery of America by Europeans the Indians were in the sole and undisputed possession of the country, and there was no one to question their title. The legal effect of the coming of the white man is most luminously set forth in an opinion of the Supreme Court of the United States, delivered in 1823 by Chief Justice Marshall in *Johnson* v. *McIntosh*, 8 Wheat. 543, 572, *et post*. The decision of the court was that a title to lands, under grant to private individuals, made by Indian tribes or nations northwest of the river Ohio, in 1773 and 1775, cannot be recognized in the courts of the United States. The court, *inter alia*, uses this language :

"On the discovery of this immense continent, the great

nations of Europe were eager to appropriate to themselves so much of it as they could respectively acquire. Its vast extent offered an ample field to the ambition and enterprise of all ; and the character and religion of its inhabitants afforded an apology for considering them as a people over whom the superior genius of Europe might claim an ascendancy. The potentates of the old world found no difficulty in convincing themselves, that they made ample compensation to the inhabitants of the new, by bestowing on them civilization and Christianity, in exchange .for unlimited independence. But as they were all in pursuit of nearly the same object, it was necessary, in order to avoid conflicting settlements, and consequent war with each other, to establish a principle, which all should acknowledge as the law by which the right of acquisition, which they all asserted, should be regulated, as between themselves. This principle was, that discovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession. The exclusion of all other Europeans, necessarily gave to the nation making the discovery the sole right of acquiring the soil from the natives, and establishing settlements upon it.. It was a right with which no Europeans could interfere. It was a right which all asserted for themselves, and to the assertion of which, by others, all assented. Those relations which were to exist between the discoverer and the natives, were to be regulated by themselves. The rights thus acquired being exclusive, no other power could interpose between them.

"In the establishment of these relations, the rights of the original inhabitants were, in no instance, entirely disregarded; but were necessarily, to a considerable extent, impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion ; but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil, at their own will, to whomsoever they pleased, was denied

by the original fundamental principle, that discovery gave exclusive title to those who made it. While the different nations of Europe respected the rights of the natives, as occupants, they asserted the ultimate dominion to be in themselves; and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in possession of the natives. These grants have been understood by all, to convey a title to the grantees, subject only to the Indian right of occupancy."

The court goes on to show how the powers of Europe, other than England, recognized this principle, and proceeds as follows:

"No one of the powers of Europe gave its full assent to this principle, more unequivocally than England. The documents upon this subject are ample and complete. So early as the year 1496, her monarch granted a commission to the Cabots, to discover countries then unknown to Christian people, and to take possession of them in the name of the king of England. Two years afterwards, Cabot proceeded on this voyage, and discovered the continent of North America, along which he sailed as far south as Virginia. To this discovery the English trace their title. In this first effort made by the English government to acquire territory on this continent, we perceive a complete recognition of the principle which has been mentioned. The right of discovery given by this commission is confined to countries 'then unknown to all Christian people;' and of these countries, Cabot was empowered to take possession in the name of the king of England, thus asserting a right to take possession notwithstanding the occupancy of the natives, who were heathens, and, at the same time, admitting the prior title of any Christian people who may have made a previous discovery."

After referring to various royal grants and charters, the court goes on in this wise:

"Thus has our whole country been granted by the crown, while in the occupation of the Indians. These grants purport to convey the soil as well as the right of dominion to the grantees. In those governments which were denominated

royal, where the right of the soil was not vested in individuals, but remained in the crown, or was vested in the colonial government, the king claimed and exercised the right of granting lands, and of dismembering the government at his will. The grants made out of the two original colonies, after the resumption of their charters by the crown, are examples of this. The governments of New England, New York, New Jersey, Pennsylvania, Maryland, and a part of Carolina were thus created. In all of them the soil, at the time the grants were made, was occupied by the Indians. Yet almost every title within those governments is dependent on these grants. . . . .

"Thus, all the nations of Europe who have acquired territory on this continent have asserted in themselves, and have recognized in others, the exclusive right of the discoverer to appropriate the lands occupied by the Indians. Have the American states rejected or adopted this principle?

" By the treaty which concluded the war of our revolution, Great Britain relinquished all claim, not only to the government, but to the 'proprietary and territorial rights of the United States,' whose boundaries were fixed in the second article. By this treaty the powers of government, and the right to soil, which had previously been in Great Britain, passed definitely to these states. We had before taken possession of them, by declaring independence; but neither the declaration of independence, nor the treaty confirming it, could give us more than that which we before possessed, or to which Great Britain was before entitled. It has never been doubted, that either the United States or the several states, had a clear title to all the lands within the boundary lines described in the treaty, subject only to the Indian right of occupancy, and that the exclusive power to extinguish that right was vested in that government which might constitutionally exercise it. . . . .

" We will not enter into the controversy, whether agriculturists, merchants, and manufacturers, have a right on abstract principles, to expel hunters from the territory they possess, or to contract their limits. Conquest gives a title

which the courts of the conqueror cannot deny, whatever the private and speculative opinions of individuals may be, respecting the original justice of the claim which has been successfully asserted.   .   .   .   .

"However extravagant the pretension of converting the discovery of an inhabited country in conquest may appear ; if the principle has been asserted in the first instance, and afterwards sustained ; if a country has been acquired and held under it ; if the property of the great mass of the community originates in it, it becomes the law of the land and cannot be questioned.   So, too, with respect to the concomitant principle, that the Indian inhabitants are to be considered merely as occupants, to be protected, indeed, while in peace, in the possession of their lands, but to be deemed incapable of transferring the absolute title to others.   However this restriction may be opposed to natural right, and to the usages of civilized nations, yet, if it be indispensable to that system under which the country has been settled, and be adapted to the actual condition of the two people, it may, perhaps, be supported by reason, and certainly cannot be rejected by courts of justice."

Roger Williams, the founder of our State, denied the justice of the white man's laws as to Indian lands more than two hundred and sixty years ago.   The early settlers of Plymouth Colony and Massachusetts Bay very largely ignored the right of the Indian to recognition, and, too often, relying solely on the grant of the soil by the crown in their charters, expelled the natives by force from the occupation of desired territory.   Governor Winthrop, in his history of New England, Vol. I., p. 122, writing under date of December 27, 1633, says : "The governour and assistants met at Boston, and took into consideration a treatise, which Mr. Williams (then of Salem) had sent to them, and which he had formerly written to the governour and council of Plimouth, wherein, among other things, he disputes their right to the lands they possessed here, and concluded that, claiming by the king's grant, they could have no title, nor otherwise, except they compounded with the natives.   For this, taking advice with

some of the most judicious ministeri, (who much condemned Mr. Williams's error and presumption,) they gave order, that he should be convented at the next court, to be censured, etc." Again, under date of November, 27, 1634, in regard to a meeting of the assistants at the governor's (p. 151), Winthrop uses these words: "It was likewise informed, that Mr. Williams of Salem had broken his promise to us, in teaching publickly against the king's patent and our great sin in claiming right thereby to this country, etc., and for usual terming the churches of England antichristian. We granted summons to him for his appearance at the next court." Williams himself says in the Key, p. 89, "The Natives are very exact and punctuall in the bounds of their Lands, belonging to this or that Prince or People, even to a River, Brooke, &c. And I have knowne them make bargaine and sale amongst themselves for a small piece or quantity of Ground; notwithstanding a sinfull opinion amongst many that Christians have right to Heathens Lands; but of the delusion of that phrase, I have spoken in a discourse concerning the Indians Conversion."

When Roger Williams was expelled from Massachusetts and sought refuge on the shores of Narragansett Bay in 1636, he at once put into operation his favorite principles of soul liberty and justice to the Indians, and, as to the latter, in his deposition about purchases from the Indians, he uses this language: "I declare to posterity that were it not for the favor that God gave me with Cannonicus, none of these parts, no, not Rhode Island had been purchased or obtained, for I never got anything out of Cannonicus but by gift." 1 R. I. Col. Rec. 25.

Roger Williams, however, speedily found out that, though dealing justly with the Indians in "compounding with them" for their lands might ease his conscience, it would not assure those lands to him, and others holding under a like title, from the adverse claims of the neighboring colonies. In the eye of the law he and the other early settlers of Rhode Island were but squatters, inhabiting vacant crown lands to which they had acquired no recognized legal title. Plymouth Col-

ony and Massachusetts Bay, under various pretexts, sought to claim jurisdiction over and possession of the soil of Rhode Island; and so great was the opposition encountered that it became apparent that only a royal grant would enable the Narragansett Bay settlements to hold their own against the conflicting claimants; hence Roger Williams was despatched to England to procure a charter, which he succeeded in doing, the charter bearing date March 14, 1643-4.

But even after the procurement of the charter the struggle between conflicting claimants went on, and for three years prevented an organization under it. Governor Winthrop says, Vol. 2, p. 220 : "The government of Plimouth sent one of their magistrates, Mr. Brown, to Aquiday Island to forbid Mr. Williams, etc., to exercise any of their pretended authority upon the Island, claiming it to be within their jurisdiction.

"Our court also sent to forbid them to exercise any authority within that part of our jurisdiction at Pawtunxet and Mishaomet; and although they had boasted to do great matters there by virtue of their charter, yet they dared not to attempt anything."

This strife among the whites stirred the Indians to action, and on the 19th of April, 1644, under the influence of Samuel Gorton, Randall Holden, and others of the Shawomet (Warwick) settlement, the Narragansetts executed a deed of submission to the king, which provided, to use their own words, "that wee, the chiefe Sachems, Princes or Governours of the Nanhigansets (in that part of America, now called New England), together with the joynt and unanimous consent of all our people and subjects, inhabitants thereof, do upon serious consideration, mature and deliberate advise and counsell, great and weighty grounds and reasons moving us thereupon, . . . . submit, subject, and give over ourselves, peoples, lands, rights, inheritances, and possessions whatsoever, in ourselves and our heires successively forever, unto the protection, care and government of that worthy and royal Prince, Charles, King of Great Britaine and Ireland, his heires and successors forever ; . . . .

to be ruled, ordered, and disposed of, in ourselves and ours, according to his princely wisdome, counsell and lawes of that honorable State of Old England ; *upon condition of His Majesties' royal protection*, and wrighting us of what wrong is, or may be done unto us, according to his honorable lawes and customes, exercised amongst his subjects, in their preservation and safety, and in the defeating and overthrow of his, and their enemies; not that we find ourselves necessitated hereunto, in respect of our relation, or occasion we have, or may have, with any of the natives in these parts, knowing ourselves sufficient defence, and able to judge in any matter or cause in that respect; but have just cause of jealousy and suspicion of some of His Majesty's pretended subjects.    Therefore our desire is, to have our matters and causes heard and tried according to his just and equall lawes, in that way and order His Highness shall please to appoint:    Nor can we yield over ourselves unto any, that are subjects themselves in any case; having ourselves been the chief Sachems, or Princes successively, of the country, time out of mind."

The king graciously accepted the submission, and vouchsafed to them his royal protection.

This submission to the king was evidently thought by the Narragansetts, at the time, to have had an important bearing upon their lands, as they sent a notice of it to Massachusetts ; and the "true and lawful owners of Shawomet," by John Warner, Secretary, also forwarded to that colony a letter "to give you," in the words of the letter, "notice hereof, at your General Court now assembled, that it may serve to inform yourselves, and all your United Colonies, of the performance of this act done, without any further pains or trouble."    1 R. I. Col. Rec. 134, 136, 139.    The constant reference, we find, to this submission by the Narragansetts when dealing with their lands, also indicates the importance they attached to it.    We fail to preceive, however, what effect it could have had upon the title to their land, unless, indeed, it put them even more under the power of the crown than they were before, by their own acknowledgment of and

submission to the power which the crown had theretofore set up and sustained by force. The crown granted nothing; abated nothing of its claim. Whatever was parted with went from the Indians to the crown, and not from the crown to the Indians. In a representation to the king by certain claimants to land in the Narragansett country, in 1680, this estimate of the effect of that submission was given, viz.: "And whereas it hath been falsely affirmed by one John Green and Randall Houlden, of Warwick, that the lands of the Narragansett were never purchased legally by any, but that the Indians gave all their lands to King Charles the first, of blessed memory, which they would seem to prove by a declaration taken out of Mr. Gorton's book" (referring to Samuel Gorton's Simplicity's Defense): "To this we answer . . . . 2dly. The subjection of the Indians, their land and their people, to his majesty, by that instrument, was, as we humbly conceive, no other than a putting themselves under the protection and owning the sovereignty of the king of England, as his royal subjects, which was the same that the Indians have ordinarily done in Plymouth colony of old, and desiring to live in amity and peace with the English under his majesty's respective government." Mass. Hist. Soc. Col. Vol. 5, Ser. 1, 230. Evidently the crown took some such view as this, for as time went on it treated the Indians the same after the submission as before, so far as their lands were concerned. Though this submission did not affect the Indians' title as against the English crown, yet the design of the instigators of that submission was to protect the Narragansetts from the aggressions of the United Colonies,[1] which were then attempting to engross the territory lying about Narragansett Bay, as seems to us from references to this submission in the second charter to Rhode Island twenty years later, for which charter some of the leading instigators of this submission were petitioners. The home

---

[1] In 1643 Plymouth colony, Massachusetts Bay, and the two English colonies on the Connecticut river, formed a union for mutual assistance and protection, under the name of the United Colonies of New England, but Rhode Island was never a member of it; indeed, she was denied admission to it.

government had very confused ideas of the geography of their colonies in the new world. Conflicting grants to the same territory were made to different colonies; and royal patents, royal letters, and reports of royal commissioners wrought confusion by their conflicting terms and roused bitter contention among the colonists.

The first charter granted to Rhode Island, that of 1643–4, refers to the purchases of lands from the Indians; while the second charter, that of 1663, has numerous references to such purchases. "Whereas," runs this second instrument, after the caption, "we have been informed, by the humble petition of our trusty and well-beloved subject, John Clarke, . . . . and the rest of the purchasers and free inhabitants of our island called Rhode Island, and the rest of the colony of Providence Plantations, in the Narragansett Bay, in New England, in America, that they . . . . did transplant themselves into the midst of the Indian natives, who, as we are informed, are the most potent princes and people of all that country; where, by the good Providence of God, from whom the Plantations have taken their name, upon their labour and industry, they have not only been preserved to admiration, but have increased and prospered, and are seized and possessed, by purchase and consent of the said natives, to their full content, of such lands, islands rivers, harbors and roads, as are very convenient . . . . ; they having, by near neighborhood to and friendly society with the great body of the Narragansett Indians, given them encouragement, of their own accord, to subject themselves, their people and lands, unto us; whereby, as is hoped, there may, in time, by the blessing of God upon their endeavors, be laid a sure foundation of happiness to all America." In the grant of powers, the charter contains, among others, the following : "to direct, rule, order and dispose of, all other matters and things, and particularly that which relates to the making of purchases of the native Indians, as to them shall seem meet ; whereby our said people and inhabitants, in the said Plantations, may be so religiously, peaceably and civilly governed, as that, by their good life and

orderly conversation, they may win and invite the native Indians of the country to the knowledge and obedience of the only true God, and Saviour of mankind." The charter authorized the defence of the colony by resort to arms, "and," to quote again, "upon just causes to invade and destroy the native Indians, or other enemies of the said Colony. Nevertheless, our will and pleasure is, and we do hereby declare to the rest of our Colonies in New England, That it shall not be lawful for this our said Colony of Rhode Island and Providence Plantations, in America, in New England, to invade the natives inhabiting within the bounds and limits of their said Colonies, without the knowledge and consent of the said other Colonies. And it is hereby declared, that it shall not be lawful to or for the rest of the Colonies to invade or molest the native Indians, or any other inhabitants, inhabiting within the bounds and limits hereafter mentioned, (they having subjected themselves unto us, and being by us taken into our special protection,) without the knowledge and consent of the Governor and Company of our Colony of Rhode Island and Providence Plantations." The grant of the soil itself, in the charter, is in part in this wise: "And further, know ye, that we . . . . for us, our heirs and successors, do give, grant, and confirm, unto the said Governor and Company, and their successors, all that part of our dominions in New England, in America, containing the Nahantick and Nanhyganset, alias Narragansett Bay, and countries and parts adjacent, bounded on the west, or westerly, to the middle or channel of a river there, commonly called and known by the name of Pawcatuck, alias Pawcawtuck river, and so along the said river, as the greater or middle stream thereof reacheth or lies up into the north country, northward, unto the head thereof, and from thence, by a strait line drawn due north, until it meets with the south line of the Massachusetts Colony: . . . . to have and to hold the same, unto the said Governour and Company, and their successors, forever, upon trust, for the use and benefit of themselves and their associates, freemen of the said Colony, their heirs and assigns, to be holden of

us, our heirs and successors, as of the Manor of East Green-wich, in our county of Kent, in free and common soccage, and not in capite, nor by knight service; . . . any grant, or clause in a late grant, to the Governor and Company of Connecticut Colony, in America, to the contrary thereof in anywise notwithstanding; the aforesaid Pawcatuck river having been yielded, after much debate, for the fixed and certain bounds between these our said Colonies, by the agents thereof; who have also agreed, that the said Pawcatuck river shall be also called alias Norrogansett or Narrogansett river; and, to prevent future disputes, that otherwise might arise thereby, forever hereafter shall be construed, deemed and taken to be the Narrogansett river in our late grant to Con-necticut Colony mentioned as the easterly bounds of that Colony."

The words of the charter in regard to purchases from the Indians have been urged as evidence that the crown recog-nized the Indian title as paramount to their own, but, Chief Justice Marshall, in *Johnson* v. *McIntosh, supra*, p. 601, disposes of that contention in this wise: "Much reliance has also been placed on a recital contained in the charter of Rhode Island, and on a letter addressed to the governors of the neighboring colonies by the king's command, in which some expressions are inserted, indicating the royal approba-tion of titles acquired from the Indians.

"The charter to Rhode Island recites, 'that the said John Clark, and others, had transplanted themselves into the midst of the Indian nations, and were seised and possessed, by pur-chase and consent of the said natives, to their full content, of such lands,' &c. And the letter recites, that 'Thomas Chif-finch and others, having, in the right of Major Asperton,'" (it should be Atherton), "'a just propriety in the Narra-ghanset country, in New England, by grants from the native princes of that country, and being desirous to improve it into an English colony,' &c., 'are yet daily disturbed.' The im-pression this language might make, if viewed apart from the circumstances under which it was employed, will be effaced, when considered in connection with those circumstances.

"In the year 1635, the Plymouth Company surrendered their charter to the crown. About the same time the religious dissensions of Massachusetts expelled from that colony several societies of individuals, one of which settled in Rhode Island, on lands purchased from the Indians. They were not within the chartered limits of Massachusetts, and the English government was too much occupied at home, to bestow its attention on this subject. There existed no authority to arrest their settlement of the country. If they obtained the Indian title, there were none to assert the title of the crown. Under these circumstances, the settlement became considerable. Individuals acquired separate property in lands, which they cultivated and improved; a government was established among themselves; and no power existed in America which could rightfully interfere with it.

"On the restoration of Charles II., this small society hastened to acknowledge his authority, and to solicit his confirmation of their title to the soil, and to jurisdiction over the country. Their solicitations were successful, and a charter was granted to them, containing the recital which has been mentioned. It is obvious, that this transaction can amount to no acknowledgment, that the Indian grant could convey a title paramount to that of the crown, or could, in itself, constitute a complete title. On the contrary, the charter of the crown was considered as indispensable to its completion.

"It has never been contended, that the Indian title amounted to nothing. Their right of possession has never been questioned. The claim of government extends to the complete ultimate title, charged with this right of possession, and to the exclusive power of acquiring that right. The object of the crown was to settle the sea coast of America; and when a portion of it was settled, without violating the rights of others, by persons professing their loyalty, and soliciting the royal sanction of an act, the consequences of which were ascertained to be beneficial, it would have been as unwise as ungracious, to expel them from their habitations, because they had obtained the Indian title, otherwise

than through the agency of government. The very grant of a charter is an assertion of the title of the crown, and its words convey the same idea. The country granted, is said to be 'our island called Rhode Island;' and the charter contains an actual grant of the soil, as well as of the powers of government.

"The letter[1] was written a few months before the charter was issued, apparently at the request of the agents of the intended colony, for the sole purpose of preventing the trespasses of neighbors, who were disposed to claim some authority over them. The king, being willing himself to ratify and confirm their title, was, of course, inclined to quiet them in their possession. This charter, and this letter, certainly sanction a previous unauthorized purchase from Indians, under the circumstances attending that particular purchase, but are far from supporting the general proposition, that a title acquired from the Indians would be valid against a title acquired from the crown, or without the confirmation of the crown."

The Atherton purchase, so-called, was a pregnant cause of contention between the Rhode Island claimants of the Narragansett country and those who desired to transfer that territory to the jurisdiction of Connecticut. These purchases, for there was more than one, were made in contravention of the express laws of the colony of Rhode Island, and the government, therefore, did not consider them valid, but treated Atherton and his company as intruders. Roger Williams says that he informed Atherton when he first came into Narragansett that his purchasing would be contrary to law. In the early summer of 1659 Coginaquand, a sachem of the Narragansetts, sold two large tracts of land to Major Humphrey Atherton and others, among them Gov. John Winthrop, the younger, of Connecticut; and a year later these grants were confirmed to the Atherton company by certain other Narragansett sachems. In September, 1660, Ninigret and other Narragansett sachems, under compulsion

---

[1] See 1 R. I. Col. Rec. 466 for a copy of the letter.

of a force sent by Connecticut, mortgaged the whole Narragansett country to the Commissioners of the United Colonies to secure the payment of a fine which had been imposed upon the Narragansetts for injuries alleged to have been done by them to the English ; and a little later they mortgaged the same territory to Atherton and his associates in consideration of their paying the prior mortgage, which was accordingly done.    The mortgage to the Atherton associates not having been satisfied within the time specified therein, Scuttup, in behalf of himself and the other sachems, delivered formal possession to the mortgagees at Pettaquamscott in the spring of 1662.    Thus the Atherton associates claimed title to all that extensive territory, and being, with few exceptions, inhabitants of the United Colonies, they used every means in their power to have it included within the territorial jurisdiction of Connecticut ; and all the more because, as Judge Potter says in his Early History of Narragansett, the validity of this mortgage and delivery turned wholly on the question of jurisdiction.    If the jurisdiction of Narragansett belonged to Rhode Island, then these proceeding were illegal and void ; and they were always so regarded by the Rhode Island government.    If it belonged to Connecticut or Plymouth, the case would have been different.

For more than forty years longer the struggle between Rhode Island on the one side, and Connecticut, supported by the United Colonies, on the other, waged bitterly.    In 1662, Connecticut obtained a royal charter which, it was claimed, included this very territory.    In the next year the Rhode Island charter was granted, and, though it clearly included the Narragansett country, as we have already seen, it by no means ended the dispute.    Royal commissioners sought in vain to settle the differences, and divers committees worked to the same end.    A royal commission, in March, 1664–5, referring to the submission of the Narragansetts to the king, of April 19, 1644, hereinbefore mentioned, and to injuries which some of the sachems complained they had received from several of his majesty's English subjects, against whom they desired justice, ordered that the Narragansett country

should thereafter be called the Kings Province; that the
mortgage to Atherton and others should be void upon the
payment of a certain sum, and that the Atherton purchases
should also be void upon the payment of a certain other sum.
Rival governments sought to exercise jurisdiction over the
disputed territory at the same time, and each of the contend-
ing colonies arrested the officials of the other found exercis-
ing authority within it.   A condition but little short of actual
war existed in the Narragansett country, and the situation
aroused the gravest apprehension.     Notwithstanding all
these efforts, and the passage of various acts by the legisla-
tures of the contending colonies, the dissension only drew to
a close, practically, in the early part of the eighteenth cen-
tury by Connecticut's virtually conceding the point, though
the boundary line was not finally and formally settled till
February 8, 1726–7, when the order of the king in council
was made in favor of the Rhode Island contention.

Rhode Island had, of course, spent considerable sums of
money in this struggle, and, when the difficulty was felt to
be practically over, took active steps to accelerate the settle-
ment of the disputed territory.    Accordingly, in 1707, the
General Assembly caused a survey of the vacant lands in the
Narragansett country to be made.    The next year it took
action towards the settlement of conflicting claims to titles,
and a committee was appointed "to agree with Ninigret
what may be a sufficient competency of land for him and for
his men to live upon."    As a result of these proceedings
Ninigret, the sachem of the Narragansetts, on March 28,
1709, released his interest in all the vacant lands, except a
piece eight miles square, to the colony of Rhode Island.
All these vacant lands, it will be remembered, were covered
by the mortgage to Atherton and his associates, the refusal
of Rhode Island to recognize the validity of which, alone kept
the Narragansetts from being deprived of their lands at one
fell swoop.    It will be observed by reference to this deed
[R. I. Acts & Res. Jan. Ses. 1880, Ap. No. 10, p. 26], that
Ninigret makes significant reference to the Atherton diffi-
culty, "whereby," to use his own words, "I have been at

an exceeding charge by reason of their molestations, besides what great cost and charge it hath been to this, Her Majesty's, Colony of Rhode Island, etc., which amounteth almost to the value of all the lands abovesaid," *i. e.* all the vacant lands ; and again, in giving the consideration of this deed and the reasons for making it he thus proceeds : "and forasmuch as to my own knowledge the Colony of Rhode Island hath been at an exceeding charge about said land, even almost as much as it is worth; as aforesaid, and finding by experience that they were all along the best friends that my father and myself ever had in protection of us under their government, and for that, I, knowing my own inability, as aforesaid, and hoping for their further protection, have fully and clearly, by these presents, of my own voluntary will, without any compulsion, with the advice and consent of my attorneys, resigned up from me, my heirs, executors, administrators, and assigns forever, unto the Governor, and Company of Her Majesty's Colony of Rhode Island, and their successors, all the right and title that I have in the vacant lands bounded within the jurisdiction of this Colony of Rhode Island, with the privileges therein contained or appertaining. To have and to hold forever, excepting only those lands which I reserve to myselfe of the said vacant lands where I now dwell, viz :" (describing the excepted land) "all which within said bounds, I reserve to myself and my heirs forever, and do by these presents promise and engage for me and my heirs etc., for and in consideration abovesaid never to dispose of the said land or any part thereof, without the free consent of the Governor and Company of Rhode Island, or their successors etc.    Moreover, I do freely and voluntarily engage by these presents, for me, my heirs, etc., that whatsoever land I shall dispose of within the tract I have reserved in the bounds abovesaid, that if I shall dispose of any of it, in any manner or way whatsoever, without the consent and approbation of the Governor and Company of this said colony or their successors, all that is so disposed shall be forfeited to the Governor and Company of this, Her Majesty's

Colony of Rhode Island, and the disposal shall be void to all intents and purposes."

It is urged by some that these words of Ninigret in said deed—"all which within said bounds I reserve to myself and to my heirs"—act as a grant of the fee of said so-called reserved land, the word *heirs* being a limitation of a fee. We cannot adopt any such view. Ninigret was releasing his possessory title to a tract of country more easily described by general words of description, with an exception therefrom specifically, than in any other way. The instrument was not artificially drawn, and his word of *release* was *resign*, which indicates clearly his intention of surrendering up possession. "It is an obvious rule," says Chief Justice Shaw, in *Hurd* v. *Curtis et al.*, 7 Met. 94, 109, "in the construction of grants containing an exception or reservation, that the thing excepted or reserved must be out of the thing granted, or parcel of that which would have passed by the grant, if not thus excepted or reserved. An exception or reservation of something not embraced in the premises would be simply void ; there being nothing for it to operate upon. The words *exception* and *reservation* are often used indiscriminately, though there is a known distinction between them. An exception is separating part of that embraced in the description, and already existing in specie ; as excepting a particular parcel of land from a farm granted by general words. A reservation is something newly created, out of the granted premises, by force and effect of the reservation itself, as an easement out of land granted, or rent out of land demised."

The so-called reservation in this Indian deed was clearly, properly speaking, an exception, and not a reservation. It simply withdrew from the operation of the conveyance something which, but for the exception, would have passed under the general description. It has sometimes been held that an attempted reservation out of another's may operate as an independent grant to the grantor in a deed of indenture executed by both parties. Tied. Real Prop. § 843 and cases cited. Ninigret's deed, however, is not an indenture, and the colony did not execute it. So far from there being any

intention indicated of granting a fee to the Indian sachem in that instrument, just the opposite is clearly apparent; for, not content with merely excepting the part not released, he goes on explicitly to define and covenant that such excepted portion shall never be disposed of without the consent of the colony, which is quite inconsistent with a fee simple, and is just the way he was holding it before the deed was executed. All the surroundings of the transaction, as well as the phraseology of the instrument, show that, so far from seeking to enlarge his title, he was only too willing to preserve a sufficiency of land to himself and his people as he held it before; the danger of losing it all, which he had just escaped through the failure of Connecticut's claim to jurisdiction, and of the Atherton mortgagees' claim to the soil, being still vividly before his mind.

Before Ninigret's deed of 1709, several acts, even as early as 1651, forbidding purchases of land from the Indians without the consent of the colony had been passed. 1 R. I. Col. Rec. 236, 403; Pub. Laws R. I. 1719, p. 3. Votes granting permission to buy of the Indians appear in the public records, such permission being granted to Providence in 1659; 1 R. I. Col. Rec. 418; and, in 1682, the Assembly passed an act, the preamble of which ran as follows, viz.: "Whereas in the Fifteenth year of the Reign of our Royal Sovereign Lord Charles the Second, of Blessed Memory, there was a Charter Granted to this his Majesties Colony of Rhode Island, and Providence Plantations in New England, In which was contain'd many Gracious Priviledges, Granted to the free Inhabitants thereof; and amongst others of the said Priviledges, there was Granted to the General Assembly of said Colony, full Power and Authority to Make and Ordain Laws, suiting the Nature and Constitution of the Place; and in Particular to Direct, Rule and Order all matters Relating to the Purchases of Lands of the Native Indians. And this Present Assembly, Taking into their serious Consideration, That the Lands of the several Towns of Newport, Providence, Portsmouth, Warwick and Westerly, were Purchased (by the several Inhabitants thereof,) of the Native Indians, Chief Sachems

of the Country, before the Granting of the said Charter ; so
that an Order or Direction from the said Assembly could not
be obtain'd therein, and it being thought Necessary and Con-
venient for the reasons aforesaid, That the Lands of the afore-
said Towns should be by an Act of the General Assembly, of
this His Majesties Colony, Confirmed to the Inhabitants
thereof according to their Several and Respective Rights and
Interest therein ;" and then follows an act allowing, ratify-
ing, and confirming the several purchases by said towns from
the Indians.    Pub. Laws R. I. 1719, p. 35.

Since 1709 there has been much legislation as to the Indian
lands.    In 1713 an act was passed declaring all conveyances
by Ninigret without the assent of the Governor and company
of the colony to be void, imposing a fine of twenty shillings
per acre on all persons taking a deed, mortgage, or lease
from Ninigret without the consent of the colony, and also
imposing a fine of £50 upon every recorder or town clerk
recording such conveyance for each instrument so recorded.
Pub. Laws R. I. 1719, p. 69.

In June, 1717, upon the petition of Ninigret, the General
Assembly appointed "three overseers to oversee and Rent
out his lands, to prevent his being defrauded therein," and
they or any two of them were empowered to dispossess all
persons in wrongful possession of the sachem's land ; no lease
was to be for any longer term than seven years, the sachem
to pay the charge thereof ; and the overseers were to render
an account of, and surrender up their trust to the General
Assembly when thereunto required.    Pub. Laws R. I. 1719,
p. 83.    At the same time the General Assembly ordered £10
to be lent to Ninigret out of the general treasury for two
years, then to be repaid by the borrower out of the rents of
his lands ; and in 1718 it loaned him £150 more, and extended
the term for which the overseers could lease to fourteen years.
4 R. I. Col. Rec. 221, 234, 236.    In October, 1727, the fine
imposed by the act of 1663, for purchasing of the Indians
without consent of the colony, was raised from £20 to £100.
Pub. Laws R. I. 1730, p. 148; *Id.* 1719, p. 3.

At the February session, 1730–1, it was ordered that Nini-

gret, Indian sachem, be notified to appear at the next session of the Assembly, in order to take advice concerning his land ; at the May session a committee was appointed to survey several pieces of land in Westerly, now included within the present town of Charlestown, which the sachem proposed to sell ; and in June, 1731, Ninigret was authorized to sell some land, with the advice and consent of the same committee that had surveyed his land.   4 R. I. Col. Rec. 447, 450.

Upon the joint petition of Sarah Ninigret, widow of the late sachem and mother of the then sachem, an infant, and of eight other Indians named, who had been appointed by the Narragansett tribe councillors for the then sachem, Thomas Ninigret, in behalf of said sachem, of themselves and of the people of said tribe, the General Assembly at its August session, 1747, removed from office the trustees appointed the year before to manage the sachem's land, and declared null and void all leases made by them, and appointed new trustees nominated by the petitioners ; the ground for such action, as alleged in the petition, being that the removed trustees had been appointed without the desire, consent, request, or knowledge of the petitioners, such appointment being always made at the request of the sachem and his council, and that said removed trustees, without the consent of the sachem or any of his councillors, had leased land which was always kept and reserved for the tribe of Indians for planting corn and raising other necessaries for their support ; and woodland, which was always kept and reserved for the tribe of Indians for fire wood ; and the sachem's cedar swamp, which was always kept and reserved for the tribe of Indians to cut stuff on and sell the same ; all of which was contrary to what former trustees had done, and also contrary, as the petitioners believed, to the intention of the General Assembly.   5 R. I. Col. Rec. 222.

The Rhode Island Acts and Resolves contain confirmations of sales already made by the Indian sachems both before and after the deed to the colony of 1709 [R. I. Acts and Res. June, 1731, pp. 25, 26]; and also authorizations of sales by the General Assembly down to 1759 [R. I. Acts and Res.

October, 1733, p. 15; February, 1734, p. 6; June, 1745, p. 108], the sales to be made to be with the consent of a committee, or trustees, or guardians, for sometimes one phrase was used and sometimes another; but, by whatever name called, they all meant the same thing, and in May, 1738, "Trustees or Guardians" were appointed upon petition, with powers practically the same as prescribed in the act of 1717 for overseers, therein so-called [Pub. Laws R. I. 1745, p. 207], and, whatever their designation, they were obliged to account to the General Assembly, which account would be audited by a committee appointed for that purpose. R. I. Acts. and Res. Feb., 1735, p. 29; Feb., 1741, p. 10; June, 1743, p. 41; May, 1746, p. 26; July, 1746, p. 46; Aug., 1746, p. 19.

At the August session, 1759 (R. I. Acts and Res., p. 6), upon the petition of Thomas Ninigret, of Charlestown, Gentleman, representing that, having been unhappily engaged in several lawsuits in defence of his right, he hath been obliged to advance large sums of money, which with other necessary expenses for clothing, board, &c., during his minority, hath greatly involved him in debt, and as the laws of the colony now stand he cannot, in the apprehension of some, sell or dispose of his estate for the payment of his debts, and praying that the law relating to the purchasing lands of Indians may be repealed and he have the same liberty of selling and disposing of his estate, or any part thereof, as others of his majesty's subjects have, it was enacted "that all and every of the laws at any time made and passed in this colony to restrict or prohibit the native Indians, that live within the same, from selling and disposing of their estate be, and they hereby are repealed, declared and rendered null and void to every intent and purpose whatsoever." This repeal had no operation other than to exempt the sachem from the necessity of getting leave for each sale, but did not affect the colony's title to land not sold by him.

For a few years the General Assembly was relieved from Indian petitions, but for years succeeding that temporary lull Indian affairs pressed on the Assembly more strongly

than ever. At the June session, 1763, a considerable number of the Narragansetts preferred a petition representing that the land belonging to the said tribe of Indians, which was reserved by old Ninigret, was by him reserved to and for his use and the use of his said tribe and their children forever, that the law making void all conveyances made by the sachem without the consent of the General Assembly, although it had been long in force and proved very beneficial to said tribe, hath been lately repealed, in consequence whereof Thomas Ninigret, the present sachem, hath without the approbation of the General Assembly or consent of said tribe, sold and conveyed away divers tracts of land belonging to said tribe and is daily so doing, by reason whereof a great part of said tribe are in danger of being utterly deprived of the means of procuring a maintenance and must either starve or become a town charge, and praying that an act be passed to prohibit the sachem from selling any more of said lands from them (especially their particular settlements), without the consent, as formerly, of his tribe and of the General Assembly, and that, until they can be heard, he be restricted from selling any of said lands ; whereupon the General Assembly referred the petition to the next session, ordered the sachem to be served with a copy of the petition, to be cited to appear at the next session, and in the meantime to be restricted and forbidden from selling and disposing of any lands in the Narragansett country upon any pretence whatever.

At the next session, August 1763, a committee was appointed to set off and bound the various tracts of land that theretofore had been appropriated by the sachems of the Narragansett tribe of Indians, to that tribe, for their sole use, maintenance and support, he, the sachem of said tribe, agreeing and consenting to give and execute a good and effectual deed to said tribe, and also liberty of passing and repassing on his lands to the pond and sea for the advantage of fishing, which the petitioners, in presence of the upper house of Assembly, agreed to accept of.

At the June session, 1764, the committee reported "that,

agreeable to said appointment, we have been and viewed the said lands, and on examining said Indians, and others, cannot find any lands set off or appropriated by the Sachems to said Tribe, as a Tribe; but we find various tracts or pieces of lands which have been set off to particular persons or families, amounting in the whole to between two and three thousand acres, which the Sachem saith, is what he meant to give and execute a deed of to said tribe, and is still willing to do it, according to his agreement and promise at said General Assembly. But as there are large tracts of land which are neither leased by the Sachem, nor set off to any of the Tribe, but seem to be in common, used, when wanted, both by Sachem and Tribe, the petitioners insisting on that, or part of it, being set off with the rest. And whereas there is a larger number of said Tribe than the petitioners, who seem utterly against being set off, but choose to remain with the Sachem as heretofore, and say the Petitioners may be set off by themselves, but they are not willing to be set off with them; but we not having any authority to set off any lands to part of the tribe, unless we could have persuaded them to agree where and how much, so after several days waiting on them, trying to get them to agree how much to set off, and where, but we could not, we were obliged to return, and do report as abovesaid." The report was accepted and nothing more was done about it, but it is noticeable that thereafter the Indian sachems, Indian council and individual Indians, applied to the General Assembly for leave to sell when desiring to dispose of their lands. So far as we have ascertained, mention of the Indian council first appears in the Acts and Resolves of the August session, 1747, when Sarah Ninigret and the Indian council petitioned the General Assembly, as we have already stated; and at the October session, 1767, mention of the Indian council is again made, when the General Assembly voted, by and with the consent of Thomas Ninigret, sachem of the Narragansett tribe of Indians, that the said Thomas Ninigret and five of his council make, execute and give to the secretary of this colony a good and legal deed of an island in a certain swamp in this

colony, containing about three acres, whereon stands a school-house, for the use of a school for the said tribe of Indians forever, etc.   6 R. I. Col. Rec. 533, 534.   Thereafter little or nothing was done about the Narragansett tribe without the interposition in some way of the Indian council and the instrumentality of a committee appointed by the General Assembly.

Thomas Ninigret, the sachem of the Narragansetts, who died in 1769, or early in 1770, seems to have incurred many debts.   The proceedings of the General Assembly from 1768 for five years thereafter contain a number of petitions from him, his council, and his successors, as to his debts, and the General Assembly at its September session, 1770, when giving permission for sales in order to pay them, added this clause to its vote :  "and that no other of the Indian lands be thereafter sold on any pretence whatever."   At last, at the August session, 1773, forty-three Indians of the Narragansett tribe preferred a petition, representing "that some of our late sachems, through extravagance and indiscretion, had heretofore run themselves largely in debt, and for the discharging those debts we have consented to the sale of the greatest part of the most valuable lands belonging to the tribe, so that there now remaineth but a small tract compared with what they once possessed, and that they have remaining only one small piece of Fort Neck, by which they can get to the salt water, from which they fetch great part of the support of themselves and families ; and being informed by the Honorable Committee appointed by the Assembly, to settle the accompts and discharge the debts of the late sachem, Thomas Ninigret, deceased, that they apprehend that they, with our consent, have sold lands sufficient to discharge the whole of said debts," and further representing the necessity of a survey of the tribe's lands, owing to the whites having unlawfully trespassed thereon.   "And we do, on this occasion," runs the petition, "approach the General Assembly with the greater confidence, because we look upon them as our Guardians and Protectors, agreeable to the Consideration of the Deed of the Sachem Ninigret ;" referring to the

deed of March 28, 1709, already referred to in their petition. Whereupon the General Assembly voted that all the lands now of right belonging to the said tribe be secured to them, and that the same or any part thereof shall not for the future be liable to the payment of any debts; and that a survey be made as prayed, the charge thereof to be paid by said tribe.

Thomas Ninigret, whose extravagance greatly weakened his influence and that of the succeeding sachems, with the tribe, was . succeeded by his sister Esther, who married Thomas Sachem, and who went by the title of Queen Esther. She was succeeded by her son George, who died during our Revolutionary War, aged twenty-one years; and, though we find mention of Queen Esther's petitioning with her council for leave to sell Indian lands, we fail to find mention in the printed proceedings, of any vote of the General Assembly referring to petitions signed by her son George; hence we infer that after her death, rarely, if ever, was leave to sell obtained by a Narragansett sachem.   At George's death the line of sachems ceased, and the council became the head men of the tribe and discharged the functions that theretofore pertained to the sachems.   The council was an ancient Indian institution existing in the early days of the colony, and probably long ante-dating the coming of white men to these shores.   The councillors were selected by the sachem or elected by the tribe.   The General Assembly at its February session, 1792, fixed the time of meeting for the election of the Indian council, on the last Tuesday of March in each year.

The laws made did not seem to be · effectual, and at the August session, 1779, the council of the Narragansett tribe represented that some of the tribe through ignorance, and others through obstinacy, were leasing their lands for long terms of years and having the whole rent paid down, thereby practically alienating their lands; so the General Assembly voted that no Indian should make a lease except with the approbation of the Indian council in conjunction with a committee appointed by the General Assembly.   Following this, for a series of years, committees were from time to time

appointed to oversee and care for the Indian lands and for settling differences constantly arising among the Indians, the votes in the Acts and Resolves in relation to them being very numerous.   These votes seemed to accomplish but little, however, and at the February session, 1792, upon the petition of a number of persons calling themselves a majority of the tribe of Narragansett Indians, a committee, consisting of Governor Arthur Fenner and others, was appointed to make inquiry into the causes of the disputes and differences existing in said tribe, and to take the most prudent and effectual measures to terminate. them, and for that purpose to make rules, orders and regulations for transacting the public affairs of said tribe and for the well-governing thereof ; and that such rules, orders and regulations should be binding upon said tribe.   It was further voted that all males of said tribe, of twenty-one years of age, shall and may meet together at the school-house, their accustomed place of meeting, on the last Tuesday in March, A. D. 1792, and annually and every year on that day, for the purpose of electing their council, who shall be chosen by a majority of votes ; and that in such meeting and all others, and upon all occasions, every male person of twenty-one years, born of an Indian woman belonging to said tribe, or begotten by an Indian man belonging thereto, of any other than a negro woman, shall be entitled to vote.   At the June session, 1792, the committee reported in part, and among other things that before general regulations were made some person should be appointed as treasurer of the tribe, he giving bond for the faithful discharge of the duties of his office, and that in consequence of their recommendation the tribe had made choice of Mr. Enoch Crandall, of Charlestown, as their treasurer, and desired that he be appointed by the General Assembly accordingly. Whereupon the General Assembly continued this committee with enlarged powers, and appointed Enoch Crandall treasurer of the said tribe, he giving bond to the satisfaction of said committee with surety for the faithful performance of the trust reposed in him.

We find no report of this committee after the enlargement

of its powers, printed in the R. I. Acts and Resolves, but the General Assembly at its June session, 1836, appointed a committee to whom were referred all papers relating to Indian affairs then on the files of either house, said committee being instructed to examine generally into the affairs and condition of the Narragansett tribe and prepare a set of regulations for their future government; and to its report made at the January session, 1839, signed by the late Judge Potter, are appended the regulations made by the committee of 1792, and which, with regulations subsequently made, but when, is not given, it was stated were copied from the original in the hands of one of the last treasurers of the tribe. Those regulations, which, it will be remembered, were to be binding upon the Narragansett tribe, are as follows, viz.:

"In obedience to the directions, and in virtue of the powers in us vested by the act of the General Assembly, for regulating the public affairs of the Indian tribe in the town of Charlestown, and making such rules and regulations for the transacting the public affairs of said tribe, as to us shall seem most suitable to the circumstances of said tribe and the well governing thereof, have made the following rules and regulations: '1st. All leases hereafter made of the tribe's land, shall be made by the Indian council; and if in the opinion of the treasurer, the lands are leased to the value, to be by him approved, and not otherwise. And all leases made by individuals of their lands, shall be approved by the council and treasurer as above expressed: that no leases shall be made for a longer term of time than one year, except in cases of removal. That the leases made of the tribe's lands shall be lodged with the treasurer; and the money arising from the leases to be by him collected and remain in his hands, to be appropriated to and for the use of the poor of said tribe, in such manner as the treasurer and the council, who are considered as the overseers of the poor of said tribe, shall consider most conducive to the relief of the poor of said tribe; which appropriations shall be made in the same manner as appropriations of a similar nature are made to the white people by the laws of this State, and not otherwise; and also

for the payment of the debts of said tribe (which debts shall be ascertained by the existing committee appointed by the General Assembly, for superintending and regulating Indian affairs), in consequence of an order drawn on the treasurer, by a majority of said committee.

" ' 2d.    If any Indian or Indians remove from the tribe to the Oneida nation, or other Indian nation for settlement, he or they so removing, shall not have the privilege of leasing his or their lands for any longer term than six years, and at the end of six years, the lands shall be improved by the heir or heirs of the person so remaining ; and in case no heir or heirs be left, the lands to be rented by the council and appropriated by the treasurer ; the rents arising therefrom, to be appropriated to and for the use of the poor of said tribe.

" ' 3d.    The lands occupied by any Indian of said tribe in his own right heretofore deceased, or who shall hereafter decease, the lands by him or her occupied, shall descend to and be equally divided among the children of the deceased, agreeable to the now existing laws of the State, making provision for the more equal distribution of intestate estates ; and that partition be made thereof by the council, and approbated by the existing committee of Indian matters.

" ' 4th.    That in future there shall not be any wood or timber cut or sold off the tribes lands or orphans lands of said.tribe ; but an individual of the tribe may have liberty, with consent of the Indian council and approbation of the treasurer, to cut firewood and timber and poles for fencing his own lands or particular use.

" ' 5th.    That the council with the approbation of the treasurer, lease out the lands of all deceased persons who died indebted to doctors, and for necessaries furnished them in their last sickness, and the treasurer to appropriate the money arising therefrom, to the discharge thereof ; Provided, the heirs of said deceased person refuse to discharge said debts.'

Charlestown, Dec. 17, 1792.

A. FENNER,              PELEG ARNOLD,
THOS. G. HAZARD,     THOS. HOLDEN."

"Regulations subsequently made.

"Whereas, in the regulations heretofore made, the Indian council were solely authorized to make partition of the lands that fell to the heirs of the deceased, which regulation appears not to answer the intended purpose : it is therefore resolved, that in future, when partition of lands is to be made in the manner aforesaid, the same is to be done by the council and treasurer, and in no other manner.

"And it is further resolved, that when any of the Indians die, the treasurer and council take an inventory of the personal estate of the deceased ; and that the same be disposed of under the directions of the treasurer, for the purpose of discharging the expenses in their last sickness and funeral expenses."

Judge Potter, in his report of 1839, in speaking of the rules of the committee of 1792, says : "One of them, No. 3, introduces, among the Indians, the statute rules of descent ; thus virtually doing away with any rules derived from their old customs and usages. But since the discontinuance of the office of treasurer, who acted generally as a sort of overseer of the tribe, the council have managed these things, according to their own will and pleasure."

Enoch Crandall, we have seen, was elected treasurer in 1792, but he resigned in 1810, and was succeeded by Joseph Stanton, Jr., who held the office until it was discontinued in 1818.

Notwithstanding the solemn declaration made that no more Indian lands would be allowed to be sold on any pretence whatever, votes were passed from time to time authorizing the sale of the common lands, as well as individual's lands. R. I. Acts and Res., June Ses. 1800, p. 26 ; Oct. Ses. 1803, p. 34; Oct., 1811, p. 23; Feb., 1813, p. 14; Oct., 1818, p. 53; Jan., 1831, p. 15, besides many others. Disputes were constantly arising among the Indians, and numerous committees were appointed in the vain attempt to prevent dissensions and to compose differences. R. I. Acts and Res., Oct., 1809, p. 21; June, 1817, p. 35; June, 1818, p. 49, when the office of treasurer was abolished ; Feb., 1821, p. 30; Oct., 1828, p. 71.

Laws of varying character were from time to time passed in the fruitless endeavor to keep the Indians in possession of their lands. The land of the Narragansett tribe, held either by the tribe or in severalty, according to their usages, was not taxable down to the very end of the existence of the tribe, and even that held in fee simple by an Indian was not taxable for the support of the poor or the erection or repair of school-houses, though the State practically maintained the Indian school, and the tribe was not always equal to the support of its poor.

As early as May, 1718, it was enacted that no Indian should be sued for debt. Pub. Laws R. I. 1719, p. 85. This was modified, however, in 1724, so as to restrict it to "the present family of Ninigret, the late Indian Sachem, deceased, and to those that shall be of his Race, and to no other Indian whatsoever," excepting, as to other Indians, claims for strong liquors and tavern scores [Pub. Laws R. I. 1730, p. 133], and in 1728 it was wholly repealed. Pub. Laws 1730, p. 168. In 1783 it was enacted that in every action brought, or to be brought, for any bond, note, or other instrument, given or entered into by any of the Narragansett tribe of Indians for the payment of money or the delivery of articles, proof should be made of full and just value having been paid for the same, before judgment should be made up by any court of law in favor of the person bringing such action, and for want of such proof such action should be dismissed with costs. R. I. Acts and Resolves, Dec. Ses. 1783, p. 5.

In November, 1811, the tenure of Indian land was confirmed, and a still more stringent act against suing Indians was passed. "Whereas the tenure of lands," ran the act, "belonging to the Narragansett tribe of Indians in this State, is derived to them from their ancestors; and depends upon tradition, and usage among themselves; and whereas it is proper that said tenure should be secured to them by statute: Sec. 1. Be it enacted, &c., that said tenure as evidenced by their tradition and usages, be and hereby is declared the legal tenure of said lands, and be and is hereby confirmed accordingly. Sec. 2. And be it further enacted, that no writ or

process at law, shall be brought against the said tribe, or against any individual thereof, for the recovery of any debt, contracted subsequently to the passing of this act; that it shall be the duty of all Courts and Justices in this State, and it is hereby required of them, in case of any such writ or process, to dismiss the same, and to adjudge double costs against the plaintiff." This latter act, subsequently restricted so far as members of the tribe were concerned to those resident in the town of Charlestown, continued in force so long as the Indian tribe was recognized by the State.

In May, 1803, it was enacted that any of the Narragansett tribe committed to jail for debt, either on mesne process or execution, should be considered a poor prisoner under the act for the relief of poor prisoners, "notwithstanding such prisoners may have estate, real or personal, in common with the said tribe, or otherwise; and shall be entitled to, and may receive, all the benefits and advantages of said act." The words, *or otherwise*, were stricken out in 1857, and the act, thus amended, continued in force until 1880, when said cap. 800 was passed.

In January, 1840, a new scheme was devised for dealing with the Indian question, and it was enacted that the governor should annually appoint a commissioner of the Indian tribe, who should give bond for the faithful discharge of his duty and should be paid by the State, the treasurer, who was abolished in 1818, having been paid by the tribe, which caused the abolishment of that office. The duties of the Indian commissioner, which continued with but slight alterations throughout the remaining existence of the tribe, were to superintend the affairs of the tribe; to bring, in his own name, all actions in behalf of the tribe; to settle all controversies among its members relating to their estate, real or personal, or any other matter, subject to an appeal to the General Assembly; to enforce all laws made for the prevention of the sale of intoxicating liquors among the members of the tribe, and for the protection and security thereof; to report from time to time to the General Assembly the condition of the tribe, and any facts relating thereto which he

might deem material to have brought to the notice of the General Assembly ; to bring in his own name any action necessary to recover damages from flowage or other trespass done by any Indian, or other person whatever, to any land belonging to the tribe, or to any Indian land the owner of which might be under age, absent or unknown, with authority to compromise any such action and receive the damages for the benefit of whom it might concern.     R. I. Pub. Laws, p. 2003 ; Gen. Stat. 345.

Authority to sell Indian land, when thereafter applied for to the General Assembly, was most usually granted with the provision that such sale should be made under the advice and direction, or with the consent of the Indian commissioner ; and often upon condition that he receive and invest the proceeds of sale and pay it over from time to time as the applicant needed, or among the heirs or creditors of a deceased person.     Once, at least, upon the petition of the Indian council, the Indian commissioner was appointed guardian of an Indian's estate, with directions to report his doings and render his account from time to time to the town council of the town of Charlestown.     R. I. Acts and Res. Jan. Ses. 1863, p. 270.     Sometimes the land authorized to be sold was to be held by the purchaser thereof according to the laws and customs which regulate the affairs of the Narragansett tribe [R. I. Acts and Res. June Ses. 1846, p. 59], and sometimes the deed was to vest in the purchaser a full and perfect title in fee simple.     R. I. Acts and Res. Jan. Ses. 1847, p. 34.     Over forty sales were authorized to be made under the direction of the Indian commissioner during the existence of that office.

The General Assembly at its October session, 1849, enacted that if any member of the Indian tribe should, without the consent of the council of the tribe, cut or carry off from any of the common tribe land any grass, wood, brush, bark or other material or substance whatever, he should be subject to the same penalties, to be recovered in the same manner, as if the same had been done by a person not a member of the tribe ; and, further, that the council of the Indian

tribe might thereafter lease the tribe land and other Indian land according to their old usages and customs, and regulate the same, and apply the proceeds thereof to the support of their poor and other expenses until the further order of the General Assembly.

Although the third report of the commission appointed under the act of 1880, contains, in Appendix D, what is there called a "Constitution of the Narragansett Indian Tribe," yet we have been unable to find any proof that it was ever adopted, a draft of it merely being found among the Indian papers; and we are credibly informed that they never had or used a common seal, such as is referred to in section 9 of said draft.

The hold of the Narragansetts, even in civil matters, grew more and more feeble, and they gradually became more and more dependent upon the State, until their moribund condition as a tribe became apparent even to themselves. In criminal matters they had almost from the first been amenable to the white man's laws. As early as 1640, at Newport, Gov. Coddington, with the rest of the assistants, and Miantinomi, sachem of Narragansett, with the rest of the sachems, agreed to certain propositions as to the punishment of Indians for crimes, which were ratified by the General Court in August, 1640. 1 R. I. Col. Rec. p. 107. In 1659 a very drastic measure in regard to Indians stealing was passed [*Id.* p. 412]; and for the gravest offences, likewise, Indians, as early at least as 1671 and 1673, were tried and punished by the colony [2 R. I. Col. Rec. pp. 393, 509]; and so they continued to be as long as the Narragansett tribe existed. In September, 1770, a committee, of which Stephen Hopkins was chairman, appointed to settle Indian differences and to allay discontent, reported that the Indians requested that the General Assembly would appoint two of them justices of the peace, for punishing drunkenness, breach of the peace, and other offences amongst themselves, and the committee recommended it, but the General Assembly refused to adopt the measure.

For at least thirty years before the passage of cap. 800, it was apparent that the Narragansett tribe had become extinct

48

in all but name. Its members had even ceased to be red men, for their complexions had been darkened by the plentiful infusion of negro blood, or bleached by the admixture of blood from Caucasian veins. From the report of a committee referred to in the Indian commissioner's report of 1858, we learn that, in 1833, the whole number, of all grades and conditions, residing in Charlestown at that time, was one hundred and ninety-nine. Of this number only seven were of genuine Narragansett blood; fourteen were about half blood; one hundred and fifty-eight were of other grades, less than half; and twenty were foreigners having no connection with the tribe, except by marriage or other promiscuous intercourse. All of the whole blood were aged females; most of the half blood were females; and the one hundred and fifty-eight of less than half blood were, in the opinion of the committee, of probably more than three-fourths of the African negro race. From fifty to eighty, partially of Narragansett extraction, were supposed to be absent. The commissioner of the Indian tribe, in his report to the General Assembly at its January session, 1858, says: "The whole number of all grades residing in Charlestown at the present time, is one hundred and forty-seven. Of this number, fifteen are foreigners, eleven of them being connected with the tribe by marriage, and four by illicit intercourse. Of the whole number, there is not an Indian of full blood remaining; only two of three-fourths, and nine of half blood. The one hundred and twenty-one less than half blood are of mixed grades of Indian, Negro, and White. Of the number absent, claiming connection with the tribe, I have no means of knowing. Some estimate them from one hundred and fifty to two hundred."

So rapid was the decay of the tribe, or at least of the part located at Charlestown, that the same commissioner reported on December 27th of that same year, 1858, in reply to an inquiry by Governor Dyer, printed in an appendix to the Acts and Resolves of the January session, 1859, that "the number of persons at present claiming Indian descent, or regarding themselves as such, is one hundred and twenty-two,

of which number fifty-two are males, and seventy are females. The whole number is divided into thirty-four families, with an average of about four members to the family. . . . . . Of the whole number of persons belonging to the tribe (122), twenty-eight can read and not write; forty can read and write; leaving fifty-four who can neither read nor write."

The commissioner's tables show that the average age of the oldest family of the tribe was 79 years; that three families averaged 70 years or upwards; six between 60 and 70 years; and two between 50 and 60 years; the average age of the remaining families being less than 50 years. In regard to the purity of Indian blood there were two of three-quarters blood, ten of half blood, forty-two of one-quarter blood, and sixty-eight of less than one-quarter blood.

Of course it was only a question of time how long such a state of things would be permitted to exist. At the January session of the General Assembly, 1852, a committee, of which the late Judge Potter was chairman, directed attention to the fact that the time must soon come when the public good would require that the members of the Narragansett tribe should be placed on the same footing as other citizens of the State. A note to that report stated that "the objection made by the tribe to being subject to the same laws as the whites, is, that they should be soon traded out of their property, and they should be left poor and dependent upon the whites for support." The commissioner of the Indian tribe, in his report to the General Assembly in 1857, suggested some provisions worthy of consideration when the time for such a change should come, and said: "It is believed that there are many of the tribe who would be very willing, and some, indeed, anxious to be put on the same footing, as to property, with white citizens." The year following, the commissioner of the Indian tribe presented a very informing report and used this language: "It would, no doubt, be better for the tribe and the town, if their condition were changed, and they were placed on an equal footing with other citizens of the State." At the January session, 1859, the chief executive of the State, Governor Elisha Dyer, Sr.,

in an executive communication called the attention of the
General Assembly to the desirableness of immediate action
in effecting a change in the status of the Narragansett tribe ;
and at the May session, 1866, a committee was appointed
" to inquire into the expediency of withdrawing the guardian-
ship of the State from the Narragansett Indians, and to pro-
vide for the settlement of their tribal affairs, and the distri-
bution of their tribal lands among the members of the said
tribe ; " which committee reported that the tribe was not yet
ready to agree to such a measure.

At last, upon the petition of Gideon Ammons, president of
the Indian council, and others, members of the council and
tribe of Narragansett Indians, living in the town of Charles-
town, presented to the house of representatives at the Jan-
uary session, 1879, praying that a committee be appointed
to investigate the affairs of said tribe, a resolution was unani-
mously adopted appointing a select committee of three to
inquire into the justice, expediency, and practicability of
abolishing the tribal relations of the Narragansett Indians ;
of conferring the rights of citizenship upon the members
thereof ; and of the most equitable manner of disposing of the
land belonging to said tribe, etc.    The committee held several
public meetings in the town of Charlestown, after due notice
given, heard the petitioners and all others, whether belong-
ing to the tribe or not, that wished to be heard, and, after
mature consideration, made an able and elaborate report,
submitting the draft of an act which in its terms and pro-
visions embodied the recommendations of the committee in
the premises for a final solution of the question.    Upon that
report the General Assembly enacted said cap. 800, at its
January session, 1880.

We have the direct statement of the committee reporting
the act, that " at a meeting with the Indian Council, Decem-
ber 26, 1879, an agreement on the part of said council, was
made, that in behalf of the tribe, they would quitclaim to
the State, the interest of said tribe in the common, tribal, or
vacant lands, and all other tribal rights and claims for the
sum of five thousand dollars." In addition to this the first.

report of the commission appointed under cap. 800, Appendix B, p. 23, contains this paragraph: "The next meeting of the tribe was in March" (1880) "when the tribe elected their Council for the year ensuing. On that occasion the act which was passed in the Assembly last winter was publicly read before the meeting, and the contract entered into by the Indian Council with the Committee was commented upon and known to all parties present. The result of that meeting was the re-election of the old Council, which was proof positive in our minds that the transaction they had entered into with us in behalf of the tribe was satisfactory to the tribe."

It is also apparent on the face of the act that it was passed by consent and agreement with the recognized representatives of those to be affected by it. The instrumentalities on the part of the State to carry out the detail of the act were three commissioners, one to be appointed by the Governor of his own motion, one by the Governor on the nomination of the council of the Narragansett tribe, and one by the speaker of the house of representatives, and any vacancy that might occur was to be filled in the same manner as the person previously occupying the position so vacated was originally appointed. The second section of the act authorized, empowered, and directed said commissioners for and in behalf of the State to negotiate with and purchase from the Narragansett tribe of Indians all their common tribal lands, now contained within the Indian reservation, so-called, as bounded A. D. 1709, and all their other tribal rights and claims, of whatsoever name and nature, for a sum not exceeding five thousand dollars; and for and in behalf of the State, to receive from the council of said tribe a quitclaim deed to the State of all said lands, rights and claims; which deed, executed and delivered by the council of said tribe, or by a majority of them, shall vest in the State all the right, title, interest and property of said tribe in and to the premises so quitclaimed as aforesaid. If the council of the Indian tribe had refused either to nominate a commissioner or to execute the deed, then the act would have become nugatory, at least so far as

the transfer of the common tribal lands and the disposition of the proceeds thereof were concerned, for there were no coercive provisions in said act attempting to invest the State with any title in said land in case of the failure of the voluntary methods provided for therein.

Section 9 provided as follows: "From and after the passage of this act, the tribal authority of the Narragansett tribe of Indians shall cease, except for the purpose of carrying the provisions of this act into full effect; and all persons who may be members of said tribe shall cease to be members thereof, except as aforesaid, and shall thereupon and thereafter be entitled to all the rights and privileges, and be subject to all the duties and liabilities to which they would have been entitled or subject had they never been members of said tribe; provided, however, that all members of said tribe who shall at that time be paupers, and all members of said tribe who shall thereafter, and before gaining settlement in any town, become paupers, shall be held and considered State paupers to all intents and purposes," etc. Sec. 10 provided that the same exemption from suit, in force at the date of the passage of said act, should continue in force as to the Indian tribe and as to any person then a member thereof and then resident in the town of Charlestown, in regard to any debt contracted or incurred prior to the passage of said act; and that any person, a member of said tribe at the date of the passage of said act, committed to jail for debt contracted or incurred prior to said last mentioned date, should have the same relief as a poor debtor that he would have been entitled to prior to the passage of said cap. 800. If the land had not been deeded the tribe would still hold it, though, so far as the State was concerned, the tribe would not have been recognized otherwise than as the owner of the possessory title to the common tribal lands, so-called, and as provided for in said cap. 800. Confusion and embarrassment, indeed, might have been caused by a failure to carry out in all its parts the concerted plan of procedure on which the act was evidently predicated. We see no obligation upon the State to have continued to recognize the tribe otherwise than in

its property rights, and as provided for in the act, any longer than the State saw fit. The members of the Narragansett tribe, before the passage of said cap. 800, were simply a highly favored class in the State. They enjoyed various immunities, such as exemption from suit, the right to take the poor debtor's oath though possessing property, certain exemptions from taxation, etc., which no citizen of Rhode Island or of any other State or nation, resident here, enjoyed. We find no contract in existence between the colony or State of Rhode Island and the Narragansett tribe which the withdrawal of such immunities would violate. Neither the acts of the colony nor of the State disclose any such contract, and the deed from Ninigret, in 1709, which the Indians continually referred to as their main bulwark, reveals nothing of the kind. Ninigret, in the latter, refers to the colony of Rhode Island, as we have already seen, as "the best friends that my father and myself ever had in protection of us under their government, . . . . and hoping for their further protection," etc., as reason, together with the great expense the colony had been put to in regard to the Narragansett country, for making the deed; but that, certainly, creates no contract for the enjoyment of any greater immunities than any other holders of land in the colony or State possessed. The Narragansett tribe was not, in our opinion, a corporation, or quasi corporation, with vested corporate rights in the immunities named; so the Dartmouth College case, 4 Wheat. 518, would have no application here. Even the gratitude Rhode Island bears to Canonicus and Miantinomi and their descendants, had no proper object, in 1880, on which to operate, as the committee reporting said cap. 800 truly said of the Narragansetts: "Their extinction as a tribe has been accomplished as effectually by nature as an *Act* of the General Assembly will put an end to the name." Of course if the Narragansett tribe has agreed to said cap. 800 by parting with their tribal lands and becoming citizens, no possible question as to said chapter's being in violation of a contract could possibly arise in any connection.

Did the Narragansett tribe make a valid deed of their com-

mon tribal land and all their other tribal rights and claims of whatsoever name and nature? In the sketch of the government and usages of the Narragansetts, drawn from history and the dealings of the colony and State with them hereinbefore given, we have seen that the title of the tribal lands, or the right to convey them, so far as the Narragansetts themselves were concerned, was in the sachem; then in the sachem and council; and finally, when the line of sachems ceased, in the council of the tribe; not, in either case for their own use merely, but for the benefit of the tribe. Latterly, but little, if any, of the common tribal land had been sold outside the tribe, for, excluding ponds, the common tribal land had dwindled down to less than a thousand acres in 1879, the committee reported; the vast majority of it being either a swamp, or barren and worn out, and of little value. It will be remembered that the sachems, in the early history of the tribe, set off to individual members of the tribe pieces of land for their use in severalty, a course afterwards pursued by the council, and these lands thus set off were no longer termed common tribal lands, but individual lands, or land in severalty, and such individual lands were not conveyed nor sought to be conveyed to the State by the deed under said cap. 800. Though, as we have seen, there are more or less acts and regulations, comparatively recently, bearing upon the council's leasing and otherwise relating to the care of the common tribal lands and the management of tribal affairs, there is little in regard to the sale of the common tribal lands; and that is to be accounted for, it seems to us, in this wise: The sale of tribal land was deprecated by the State so long as the tribe remained in existence, and declarations had been more than once made that no such sales would be allowed; so, of course, no general rules as to sales were made, as were made in the case of leasing and other temporary management, leaving such unusual acts as sales for special legislation and management as formerly. The council of the tribe, however, exercised the power of sale as we have seen, and, in 1880, still had the power by usage and tradition; and the

exercise of such power seems to have been acquiesced in by the tribe as well as to have been authorized by the State.

The second section of chapter 800, provides, not for a compulsory taking of the land, but for a purchase upon a price apparently already agreed upon, as the committee reporting the act had practically already agreed upon a price, and it only remained to legally carry out the negotiation ; for the act not only authorized and empowered, but directed the commissioners to negotiate and purchase, hence such a direction, the price being named in the act, amounted merely to a direction to carry out a bargain already informally agreed upon, if the seller should adhere to the proposed terms.   The thing to be purchased was the common tribal lands within a certain prescribed territory, and all other tribal rights and claims of whatever name and nature.   The phrase, "and all other tribal rights and claims of whatever name and nature," evidently could apply only to property rights and claims, for all immunities enjoyed by statute were taken away by the repeal of such statute.   Ninigret's deed of 1709 had passed all Indian lands except the Reservation, so-called, parts of which Reservation had already been sold, or transferred to individual Indians in severalty; but all property rights and claims belonging to the tribe, as a tribe, and not to individual members of it, appurtenances it might be, were transferred. The common tribal lands were, practically, the only community of interest that held the tribe together, so when they were sold the tribe would fall to pieces for lack of cohesive force; hence the sale of the lands was in effect an acquiescence in the legal extinction of the tribe.

The State has been called the guardian of the Narragansett tribe, and it may be queried how the guardian could properly buy of the ward.   The State, it will be borne in mind, had an interest in the common tribal lands subject to the Indian possessory title ; but be that as it may, without stopping to discuss whether there is any constitutional impropriety in the State's authorizing a guardian to buy of his ward, or a trustee of his *cestui que trust*, as mortgagees are now allowed by law to buy at mortgagee's sales, it is suffi-

cient to say that in our opinion the State is guardian, if at all, only in a general, and not in a technical sense; just as the State, being the government, is guardian or protector of all in anywise within its jurisdiction. The Indians themselves, as we have seen, spoke of the State as their protector, quite as much as their guardian. In the same way the Indians have been spoken of as wards of the State, not in a technical sense, but merely because from their defencelessness they needed more oversight or protection, as a class, than the dwellers within the State generally did. Certainly there is no law, that we are aware of, that made the State, as a State, technically speaking, the guardian of the Indian tribe. If a committee or any officer was appointed by the General Assembly to act in connection with Indian affairs, that committee or officer accounted, but that did not make the State a guardian in the technical sense. Mr. Justice Miller, in *United States* v. *Kagama*, 118 U. S. 375, 383, in referring to certain Indian tribes, says : " These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States." His explanation, however, shows that he is not speaking in the ordinary technical sense of guardian and ward.

The State, in the purchase under cap. 800, treated the council of the Narragansett tribe of Indians as quasi trustees, and, as purchaser, charged itself with the duty of seeing to the application of the purchase money, and it required the commissioners to inquire into the claims of all persons in or to such purchase money, and for such purpose to hold meetings, after giving public notice as prescribed in said cap. 800, and hear parties interested, compel the appearance of witnesses, administer oaths, etc., with full power and authority to do and perform all matters and things requisite for the performance of their duty under the act. After hearing said parties, the commissioners were required to determine the extent and boundaries of all said lands quitclaimed to the State, and all questions of right, title, interest, and property of every kind and nature, in, to, or concerning the same, and to cause the same to be surveyed and platted in such

manner as to definitely fix the location, extent, and boundaries of said lands, and to make a list of the names of all persons, members of said Narragansett tribe of Indians, entitled to receive portions of the purchase money to be paid by the State, together with the amount which they should determine should be paid to said persons respectively, and to make a report of all said matters, and of their said determination, including said list, and file the same, together with said plat, in the office of the clerk of the Supreme Court within and for the county of Washington. It was made the duty of the clerk of the court to give certain public notice of the filing of said report and plat provided for in the act, to all persons interested therein, to appear at the next term of said court to be holden within said county next after three weeks from the publication of said notice, and show cause, if any they had, why said court should not confirm and establish said report. It was made the duty of the court at the prescribed time to examine said report and plat, and to hear all persons interested therein, with power to recommit the same to the commissioners with requisite instructions and to amend the same as law and equity might require, and, when satisfied that all the provisions of the act relating thereto had been complied with, to confirm and establish such report and plat by them approved, and to order the same to be recorded in the office of the town clerk of the town of Charlestown; and thereafterwards said report and plat were to be conclusive evidence of the right, interest, and title of the State, and of the persons named therein, in and to the lands and portions of said purchase money, therein described and assigned to them respectively by said report, at the time said report and plat should be confirmed and established by said Supreme Court, and thereupon the money was to be paid by the commissioners in manner provided for in said act.

By a supplemental act passed at the May session, 1881, being numbered cap. 897, the Supreme Court was authorized to adjourn proceedings upon said report until such time as it should deem expedient, and then to confirm and establish the same, three members of said court being required to be

present and constitute a quorum for that purpose. It was further provided in said cap. 897, that married women and minors not under eighteen years of age, entitled to a portion of said purchase money, might personally receive the same in the same manner as if unmarried and twenty-one years of age. Minors' shares might in the discretion of the commissioners be paid to either parent or to the guardian of such minor. The shares of deceased persons were to be paid to the persons entitled by the statute of distributions then in force to receive the surplus of the personal estate of such deceased persons. No portion of said purchase money was liable to garnishment in the hands of any person whatsoever, and no person who would be otherwise entitled to take the benefit of the poor debtor's oath, or of the poor tort debtor's oath, was to be refused or debarred from taking the same by reason of his right or claim to any portion of said purchase money, but might, notwithstanding any such right or claim, be admitted to take either of said oaths and the benefit thereof.

The foregoing constitute the substantial portions of both caps. 800 and 897, the remainder thereof being mere detail, mostly as to the manner of disposing of the land after it had been purchased, and is of no interest in this connection.

The act everywhere shows the greatest consideration for the Narragansetts; and the right to use and occupy for purposes of religious worship the Indian meeting-house and the lot of land containing about two acres whereon it stands, together with a suitable right of way to be laid out by the commissioners leading to and from said lot of land and the nearest highway, was granted to the religious society occupying said meeting-house during such time as they should use the same for the purposes of religious worship.

The same consideration has always marked Rhode Island's conduct with aught connected with the name of Narragansett; and two years before the passage of said cap. 800 the State caused the "Royal Indian Burying Ground," in the town of Charlestown, where are the remains of the kings and queens and principal sachems of the Narragansett nation, to be purchased, suitably enclosed, and a tablet erected with

this inscription : "This tablet is erected, and this spot of ground enclosed, by the State of Rhode Island, to mark the place which Indian tradition identifies as the Royal Burying Ground of the Narragansett Tribe, and in recognition of the kindness and hospitality of this once powerful nation to the founders of this State. Done by order of the General Assembly, at its January session, A. D. 1878." R. I. Acts and Res. Jan. Ses. 1878, p. 195. *Id.* Jan. Ses. 1879, App. No. 20.

Nowhere in said cap. 800 is there any mention of a jury trial, and what effect, if any, does such omission have upon the constitutionality of the act and the title of the land conveyed ? We do not see that it would have any. It is difficult to define the exact status of the Narragansett tribe, so-called, in Rhode Island, for it was an anomaly, an unique institution. It had some resemblance to a municipality, but it was far from being one. Its ancient usages and traditions were its landmarks, and yet, in some measure, from its connection with the State, it was more or less guided and affected by it. The council of the Narragansett tribe of Indians, we think, could sell the land and give title and possession, and we are of the opinion that they have legally and constitutionally done so under their deed and the act.

An act, however, may be constitutional in part and unconstitutional in part, and, while the unconstitutional part may be void, the constitutional part may be valid and may be carried into effect, the test in such cases being whether the parts are so interwoven and inter-dependent that they can stand only as a whole, as in *State* v. *Tonks*, 15 R. I. 385, or whether they are capable of separation and of independent administration, as in *State* v. *Clark*, 15 R. I. 383. Is said cap. 800, as amended by said cap. 897, so far as relating to the disposition of the purchase money, constitutional? The commissioners under said act were public officers under oath, and acted very much as a master might in reporting who were parties in interest in an equity suit for partition, say, for illustration, when public notice had been given to unknown parties. Their act was merely tentative ; the confirmation by the Supreme Court was the con-

clusive and binding act. There was a certain sum to be divided, and of course it had to be determined how many were entitled to it before it could be paid out. It was, indeed, an equitable proceeding. The list of persons determined by the court to be entitled contained 324 names, and the individual share for each person was $15.43. Jury trials would have been very impracticable, unless absolutely required by the constitution. The whole income of the tribe, as stated by the committee reporting the act, was but fifty dollars annually, and this had been applied by the council, 1st, to the support of the poor of the tribe, who are now provided for under the laws of the State; 2dly, to the repair of the Indian school-house, the State having supported the school itself, and the Indian children being now educated by the State; and, 3dly, to the payment of a very moderate compensation or fee to the members of the council for their services; but now the council has ceased to exist. All these objects of expenditure of the income of the tribe having been provided for by the State, the $5,000 purchase money remained to be disposed of, and so, by the same concert of action that marked the whole matter, the distribution of the amount was, by the act, to be divided among the members of the tribe living at the passage of the act; hence the council were treated, as in fact they were, as trustees, and the purchaser of the trust estate was, by the well-known rule in equity, obliged to see to the application of the purchase money. As said by Mr. Justice Douglas in *Merrill* v. *Bowler*, 20 R. I. 226, "There is no provision in the constitution of Rhode Island which provides that all controversies regarding property shall be brought in the form of a common law action or be tried by a jury. Art. 1, Sec. 15, provides: 'The right of trial by jury shall remain inviolate,'—which means simply that in those proceedings in which a right to trial by jury existed at the time of the adoption of the constitution the right shall still continue. *Crandall* v. *James et al.*, 6 R. I. 144, 148. 'The constitution requires simply the conservation, not an extension of the right of jury trial.' *Bishop* v. *Tripp*, 15 R. I. 466–469. . . . . All that

the constitution guarantees as a right is an appropriate remedy for the case, and a jury trial is not an appropriate proceeding for the enforcement of a trust." Though the matter provided for in said cap. 800, as amended by cap. 897, was anomalous, as we have before observed, yet we think the analogies of a trust are entirely applicable, and we fail to find any unconstitutionality as to the application of the purchase money.

The next and final inquiry is, what effect, if any, did Rhode Island's adoption of the Federal constitution have on her relations to the Indians and to the paramount or ultimate title to the soil—that title not included in the possessory title of the Indians? Chief Justice Marshall, as we have seen, said, in *Johnson* v. *McIntosh, supra,* "It has never been doubted, that either the United States, or the several states, had a clear title to all the lands within the boundary lines described in the treaty," (*i. e.* with Great Britain at the close of the Revolutionary War) "subject only to the Indian right of occupancy, and that the exclusive power to extinguish that right, was vested in that government which might constitutionally exercise it." The ultimate title to the soil, subject to the Indian possessory title, was in the crown by right of discovery, and the royal charter of 1663, as we have also seen, granted to the colony of Rhode Island not only jurisdictional powers of government, but also the soil, subject to the Indian title. On the declaration of independence, July 4, 1776, if not, indeed, on the 4th of May previous, when the colony abjured its allegiance to the British crown, in effect declaring its independence, the State succeeded to the rights of the colony and the rights of the crown, and still holds them, unless surrendered to the general government under the constitution, "for when the Revolution took place," in the words of Chief Justice Taney, in *Martin* v. *Waddell,* 16 Pet. 367, 410, "the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters, and the soils under them, for their common use, subject only to the rights since surrendered by the constitution to the general government;"

which remark applies with equal force to the ultimate title to Indian lands.

The Articles of Confederation and Perpetual Union between the States were agreed to by the delegates of the thirteen original States in Congress assembled, on November 15, 1777, subject to the ratification of the legislatures of the several States. The ratification was not completed until March 1, 1781, Maryland being the last to ratify, the great stumbling block in the way of the confederation being the question of western lands. New Hampshire, Rhode Island, New Jersey, Pennsylvania, Delaware, and Maryland, six out of the thirteen States, had boundaries exactly defined. Massachusetts, Connecticut, Virginia, and the Carolinas extended under their charters to the Pacific or South Sea; or to the Mississippi, since that river had by treaty been established as the British western boundary. Georgia and New York, under different pretexts, also claimed to extend to the Mississippi. The States having no special western claims insisted that the boundaries of each of the States, claiming to extend to the Mississippi river or South Sea, should be ascertained and restricted, and that the soil of the western territories be held for the common benefit of all the States, since that vast domain must needs be wrested from Great Britain by the joint efforts of all. The States with western territory ceded their claims to the United States, New York in 1780 and Georgia in 1802, and the others between those dates, so the Federal government succeeded by unquestioned title to the rights of the several States in territory thus ceded. The Louisiana Purchase from France was made in 1803, and the Floridas passed to the United States under a treaty made with Spain in 1819. Other portions of United States territory were acquired from time to time, and of course the national government succeeded to the rights of the several governments from whom it acquired territory. Rhode Island made no cession of western lands to the United States.

The Articles of Confederation, in Art. 9, provided, among other things, that the Congress of the United States should have the sole and exclusive right and power of regulating

the trade and managing all affairs with the Indians not members of any of the States.    Exactly what the words *not members of any of the States* meant, is not clear.    Whatever their meaning may have been, however, the Confederation was abandoned on the organization of the Union under the constitution in April, 1789, and as Rhode Island did not adopt the constitution until May 29, 1790, she became and remained an independent sovereign State for more than a year, and undoubtedly during that time was free from any restrictions imposed either by the Articles of Confederation or the provisions of the Federal constitution.    Upon her adoption of the constitution she became, of course, bound by its obligations and requirements.

In the constitution Indians are referred to by name but thrice.    In Article 1, § 2, Indians not taxed are excluded from representation; in Art. 1, § 8, it is provided that "Congress shall have power  .  .  .  .  to regulate commerce with foreign nations, and among the several states, and with the Indian tribes;" and in the Fourteenth Amendment, Indians, not taxed, are excluded from representative apportionment.    Sec. 10, of Art. 1, provides that "no state shall enter into any treaty, alliance, or confederation," but Indian tribes are not expressly named.    There have been many decisions in the United States Supreme Court construing, to a greater or less extent, the effect of these passages in the constitution upon the Indian tribes of the country.

In *Fletcher* v. *Peck,* 6 Cranch. 87, 142, decided in 1810, in which the question arose whether vacant lands in the State of Georgia, subject to the Indian title, could be granted by the Georgia legislature, Chief Justice Marshall said : "The question whether the vacant lands within the United States became a joint property, or belonged to the separate states, was a momentous question which, at one time, threatened to shake the American confederacy to its foundation. This important and dangerous contest has been compromised, and the compromise is not now to be disturbed.    It is the opinion of the court, that the particular land stated in the declaration appears, from this special verdict, to lie within the state

of Georgia, and that the state of Georgia had power to grant it. Some difficulty was produced by the language of the covenant, and of the pleadings. It was doubted whether a state can be seised in fee of lands subject to the Indian title, and whether a decision that they were seised in fee, might not be construed to amount to a decision that their grantee might maintain an ejectment for them, notwithstanding that title. The majority of the court is of the opinion that the nature of the Indian title, which is certainly to be respected by all courts until it is legitimately extinguished, is not such as to be absolutely repugnant to seisin in fee on the part of the state." This decision, if we correctly apprehend it, and if it still remains in force, would seem to settle one point, at least, of the question we are considering, but it is not altogether clear whether that decision would now be sustained. There are, however, so many differences between our so-called Indians in Rhode Island and the Cherokee tribe then in Georgia, and, in fact, all the other tribes directly referred to in the cases suggesting the doubt just expressed, that they do not seem to us to be applicable to our subject of consideration.

Georgia, it will be remembered, ceded its western lands to the government in 1802, and the United States agreed to extinguish the Indian title in the soil of what, after the cession of 1802, remained in the State of Georgia. In *Worcester* v. *Georgia*, 6 Peters, 515, it was held that though the Indians had by treaty sold their land within that State, and agreed to move away, which they had failed to do, the State could not, while they remained on those lands, extend its laws, criminal and civil, over the tribes; that the duty and power to compel their removal was in the United States, and the tribe was under their protection, and could not be subjected to the laws of the State and the process of its courts.

The same thing was decided in regard to the Indian tribes in New York, in the case of *Fellows* v. *Blacksmith* and others, 19 How. 366. In this case, also, the Indians had sold their lands under supervision of the States of Massachusetts and of New York, and had agreed to remove within a given time. When the time came a suit to recover some

of the land was brought in the Supreme Court of New York, which gave judgment for the plaintiff. But the Supreme Court of the United States held, on writ of error, that the State could not enforce this removal, but the duty and the power to do so was in the United States. See also *The Kansas Indians*, 5 Wall. 737; *The New York Indians*, 5 Wall. 761 ; *United States* v. *Kagama*, 118 U. S. 375.

In the case last cited, Miller, J., p. 381, says : "Following the policy of the European governments in the discovery of America towards the Indians who were found here, the colonies before the Revolution and the States and the United States since, have recognized in the Indians a possessory right to the soil over which they roamed and hunted. and established occasional villages. But they asserted an ultimate title in the land itself, by which the Indian tribes were forbidden to sell or transfer it to other nations or peoples without the consent of this paramount authority. When a tribe wished to dispose of its land, or any part of it, or the State or the United States wished to purchase it, a treaty with the tribe was the only mode in which this could be done. The United States recognized no right in private persons, or in other nations, to make such a purchase by treaty or otherwise. With the Indians themselves these relations are equally difficult to define. They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations ; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided." See also *Cherokee Nation* v. *Georgia*, 5 Pet. 1.

Does the clause in the United States constitution, giving to Congress the power to regulate commerce with the Indian tribes, preclude Rhode Island from making any agreement with the Narragansetts ? Although for years, prior to 1880, there has been, on the Rhode Island statute book, legislation in regard to the Indian tribe, so-called, providing for a cer-

tain officer entitled a commissioner of the Narragansett tribe of Indians, and making an appropriation for Indian purposes, so that so far as this State is concerned their existence was indubitably recognized and provided for, yet, as a matter of fact, as we have seen, the so-called tribe existed in little more than name, and had for years been in a practically moribund condition, being but a slender band of negroes with a slight infusion of Indian blood, with only a feeble relic of tribal organization.    The United States had never by any act recognized their existence as Indians through all the ninety years that had passed between 1790, when Rhode Island adopted the constitution, down to 1880, the date of the passage of said cap. 800.    What constitutes recognition of tribal organization or existence, as we conclude from the case of *The Kansas Indians*, 5 Wall. 737, 756, 758, is making treaties with a body of Indians, or transacting business with it through chiefs or head men, providing a reservation for it, or an Indian post or an Indian agent, or, at least, recognizing it by some positive act.    The United States are not obliged to recognize the so-called Narragansetts as Indians, any more than they are any other cluster of negroes or dusky complexioned persons, and they have never done so. Now, for nearly twenty years, Rhode Island, also, has ceased to recognize them, and the so-called Narragansetts have abandoned even their own pretensions to being a tribe of Indians ; have ceased to have any so-called tribal officers or council or head men ; and have become citizens of the State ; and have, in fact, assimilated with the general population of the State.

A few paragraphs from *Worcester* v. *Georgia, supra,* will show the view taken, in 1832, by the U. S. Supreme Court in regard to Indians generally.    Worcester was indicted by the State of Georgia for residing in a certain part of the Cherokee nation without a license, as provided for by a State law ; and, having been found guilty, the case was taken by writ of error to the Supreme Court of the United States.    The following paragraphs are from the concurring opinion of McLean, J., at p. 580 *et post:*    "At no time has the sovereignty of

the country been recognized as existing in the Indians, but they have always been admitted to possess many of the attributes of sovereignty. All the rights which belong to self-government have been recognized as vested in them. Their right of occupancy has never been questioned, but the fee in the soil has been considered in the government. This may be called the right to the ultimate domain, but the Indians have a present right of possession. In some of the old states, Massachusetts, Connecticut, Rhode Island, and others, where small remnants of tribes remain, surrounded by white population, and who, by their reduced numbers, had lost the power of self-government, the laws of the State have been extended over them, for the protection of their persons and property.

"Before the adoption of the constitution, the mode of treating with the Indians was various. After the formation of the confederacy, this subject was placed under the special superintendence of the united colonies; though subsequent to that time, treaties may have been occasionally entered into between a state and the Indians in its neighborhood. It is not considered to be at all important to go into a minute inquiry on this subject. By the constitution, the regulation of commerce among the Indian tribes is given to congress. This power must be considered as exclusively vested in congress, as the power to regulate commerce with foreign nations, to coin money, to establish post-offices, and to declare war. It is enumerated in the same section, and belongs to the same class of powers. This investure of power has been exercised in the regulation of commerce with the Indians, sometime by treaty, and, at other times, by enactments of congress. In this respect, they have been placed, by the federal authority, with but few exceptions, on the same footing as foreign nations. . . . .

"It must be admitted, that the Indians sustain a peculiar relation to the United States. They do not constitute, as was decided at the last term, a foreign state, so as to claim the right to sue in the Supreme Court of the United States; and yet, having the right of self-government, they, in some

sense, form a state. In the management of their internal concerns, they are dependent on no power. They punish offences, under their own laws, and in doing so, they are responsible to no earthly tribunal. They make war and form treaties of peace. The exercise of these and other powers, gives to them a distinct character as a people, and constitutes them, in some respects, a state, although they may not be admitted to possess the right of soil.

"By various treaties, the Cherokees have placed themselves under the protection of the United States; they have agreed to trade with no other people, nor to invoke the protection of any other sovereignty. . . . .

"Much has been said against the existence of an independent power within a sovereign state; and the conclusion has been drawn, that the Indians, as a matter of right cannot enforce their own laws within the territorial limits of a state. The refutation of this argument is found in our past history. That fragments of tribes, having lost the power of self-government, and who lived within the ordinary jurisdiction of a state, have been taken under the protection of the laws, has already been admitted. But there has been no instance, where the state laws have been generally extended over a numerous tribe of Indians, living within the state, and exercising the right of self-government, until recently. Has Georgia ever, before her late laws, attempted to regulate the Indian communities within her limits? It is true, New York extended her criminal laws over the remains of the tribes within that state, more for their protection than for any other purpose. These tribes were few in number, and were surrounded by a white population. But even the state of New York has never asserted the power, it is believed, to regulate their concerns, beyond the suppression of crime. . . . .

"When Georgia sanctioned the constitution, and conferred on the national legislature the exclusive right to regulate commerce or intercourse with the Indians, did she reserve the right to regulate intercourse with the Indians within her limits? This will not be pretended. If such had been the

construction of her own powers, would they not have been exercised ?    Did her senators object to the numerous treaties which have been formed with the different tribes who lived within her acknowledged boundaries?    Why did she apply to the executive of the Union repeatedly to have the Indian title extinguished; to establish a line between the Indians and the state, and to procure a right of way through the Indian lands ?    The residence of Indians, governed by their own laws, within the limits of a state, has never been deemed incompatible with state sovereignty until recently.    .   .   .   .

"The power to dispose of the public domain is an attribute of sovereignty.    Can the new states dispose of the lands within their limits which are owned by the federal government?    The power to tax is also an attribute of sovereignty; but can the new states tax the lands of the United States?    Have they not bound themselves, by compact, not to tax the public lands, nor until five years after they shall have been sold?    May they violate this compact at discretion?    Why may not these powers be exercised by the respective states?    The answer is, because they have parted with them expressly for the general good.    Why may not a state coin money, issue bills of credit, enter into a treaty of alliance or confederation, or regulate commerce with foreign nations?    Because these powers have been expressly and exclusively given to the federal government.    Has not the power been as expressly conferred on the federal government to regulate intercourse with the Indians; and is it not as exclusively given as any of the powers above enumerated?    There being no exception to the exercise of this power, it must operate on all communities of Indians exercising the right of self-government; and, consequently, include those who reside within the limits of a state, as well as others.    Such has been the uniform construction of this power by the federal government, and of every state government, until the question was raised by the state of Georgia.    .   .   .   .

"But, the inquiry may be made, is there no end to the exercise of this power over Indians, within the limits of a state, by the general government?    The answer is that, in

its nature, it must be limited by circumstances. If a tribe of Indians shall become so degraded or reduced in numbers as to lose the power of self-government, the protection of the local law, of necessity, must be extended over them. The point at which this exercise of power by a state would be proper need not now be considered, if, indeed, it be a judicial question. Such a question does not seem to arise in this case. So long as treaties and laws remain in full force, and apply to Indian nations exercising the right of self-government within the limits of a state, the judicial power can exercise no discretion in refusing to give effect to those laws when questions arise under them, unless they shall be deemed unconstitutional. The exercise of the power of self-government by the Indians within a state, is undoubtedly contemplated to be temporary. This is shown by the settled policy of the government in the extinguishment of their title and especially by the compact with the state of Georgia. It is a question not of abstract right, but of public policy. I do not mean to say that the same moral rule which should regulate the affairs of private life, should not be regarded by communities or nations. But a sound national policy does require, that the Indian tribes within our states should exchange their territories, upon equitable principles, or eventually consent to become amalgamated in our political communities. At best, they can enjoy a very limited independence within the boundaries of a state, and such a residence must always subject them to encroachments from the settlements around them ; and their existence within a state, as a separate and independent community, may seriously embarrass or obstruct the operation of the state laws. If, therefore, it would be inconsistent with the political welfare of the states, and the social advance of their citizens, that an independent and permanent power should exist within their limits, this power must give way to the greater power which surrounds it, or seek its exercise beyond the sphere of state authority.

"This state of things can only be produced by a co-operation of the state and federal governments. The latter has

the exclusive regulation of intercourse with the Indians ; and so long as this power shall be exercised, it cannot be obstructed by the state. It is a power given by the constitution, and sanctioned by the most solemn acts of both the federal and state governments ; consequently, it cannot be abrogated at the will of a state. It is one of the powers parted with by the states, and vested in the federal government. But if a contingency shall occur, which shall render the Indians who reside in a state incapable of self-government, either by moral degradation, or a reduction of their numbers, it would undoubtedly be in the power of a state government, to extend to them the ægis of its laws. Under such circumstances, the agency of the general government, of necessity, must cease. But if it shall be the policy of the government, to withdraw its protection from the Indians who reside within the limits of the respective states, and who not only claim the right of self-government, but have uniformly exercised it, the laws and treaties which impose duties and obligations on the general government should be abrogated by the powers competent to do so. So long as those laws and treaties exist, having been formed within the sphere of the federal powers, they must be respected and enforced by the appropriate organs of the federal government."

Some of the reasoning in the foregoing opinion seems to us faulty, and not well grounded. The utter futility, practically, of the treaty-making system of government—of attempting to deal with Indians as independent, treaty power making nations, or quasi, or semi, States or nations—seems to have been admitted by Congress in the act of March 3, 1871, embodied in § 2079 of the Revised Statutes of the United States : "No Indian nation or tribe, within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty ; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired."

It is a very strained interpretation to say that the power to regulate commerce with the Indian tribes, even in combination with the treaty-making power, carries with it the power to appropriate title to land belonging to the States— an ultimate title, resembling in some respects a reversionary interest ; a title not even belonging to the Indians, though underlying the Indian title.  Regulation is not appropriation. As well might it be urged that the power, given in the same clause of the constitution, to regulate commerce among the States, gave the United States the power to appropriate the property transported between the States, or the railroads used in such transportation, as that the title to land, subject to the Indian title, passed under a power to regulate commerce with the Indian tribes.  The tenth amendment of the constitution of the United States says :  "The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."  Where, in the constitution of the United States, is to be found the power of the United States to appropriate the land title of the States held in fee or otherwise, except, perhaps, by the exercise of the right of eminent domain, without the agreement of the respective States? If the United States desire land for a fort, or a light-house, or a post-office, belonging to the State, they obtain it either through gift or purchase of that State.

The United States have, over and over again, recognized the ultimate title in the States by taking cessions of their vacant western lands, so-called, since the adoption of the constitution, as well as by confirmations of cessions made before.  Such cessions were not of jurisdiction, merely, but of the soil, subject, as it was, to the Indian title.  If the United States already owned the title to such soil why did they pay large sums of money, as they did, for some of those cessions ? Of course as to the new States, formed out of such ceded western lands, or out of the Louisiana Purchase, or out of the Floridas, or out of any other territory they procured by cession, whether from States or foreign nations, no question need or could properly be made as to the United States get-

ting the ultimate title under the constitutional clause in regard to regulating commerce with the Indian tribes, for they unquestionably had such title by cession. When new States were erected out of United States territory, Congress invested them with State jurisdiction, but not with title to the soil, which was disposed of through the land office, by grant to railroads, or otherwise, as the United States saw fit.

As to the so-called vacant western lands of Georgia, now constituting portions of the States of Alabama and Mississippi, the United States bought of and paid Georgia for them in 1802. The articles of agreement and cession between the United States and Georgia provided that the United State should, for such cession, pay Georgia the sum of $1,250,000 out of the proceeds of the first sales of such ceded lands, and that the remaining proceeds of sales of such ceded lands should "be considered as a common fund for the use and benefit of the United States, Georgia included, and should be faithfully disposed of for that purpose, and for no other use or purpose whatever." The United States, as further consideration, also agreed to extinguish at their own expense and for the use of Georgia, as early as the same could be peaceably obtained on reasonable terms, the Indian title to all the lands remaining in the State of Georgia after Georgia's cession to the United States. That there might be no doubt or question the United States also ceded to the State of Georgia whatever claim, right, or title they may have to the jurisdiction or soil of any lands lying within the limits of Georgia (describing them) after Georgia's cession of its western vacant lands. See *The Public Domain*, a pub. doc. prepared for the Public Land Commission by Thomas Donaldson. Ed. of 1884, p. 80 *et post*. How, after all that, Mr. Justice McLean should draw any conclusion that Georgia's applications that the United States should, faster than they were doing, extinguish the Indian title as agreed, furnished any ground for the assumption that the United States alone, as contradistinguished from the old States within their own borders, could extinguish the Indian title by purchase when the Indians got ready to sell, seems to us a *non sequitur*.

Be all that as it may, however, it seems to be recognized that a time may arrive when a tribe of Indians may become so degraded or reduced in numbers as to lose the power of self-government, and that then the local law must from necessity be extended over them.　New York is referred to as a place where the criminal laws of the State had, from necessity, been extended over the Indians residing there; and yet the United States had acknowledged the New York Indians as a tribe or tribes, had made treaties with them, and the Indians lived on Indian reservations acknowledged by the United States to be such.　*The Public Domain*, 246.　If the State, then, can under such circumstances make laws for the Indians, it would seem that, by parity of reasoning, the time might arrive when the State might also extinguish the Indian title.

Even if the Narragansetts had ever been recognized by the United States as a tribe of Indians, it would seem as if the State would be authorized, by the necessities of the case, to take action.　The constitution says that Congress shall have power to regulate commerce with the Indian tribes, but the political officers of the United States have never, so far as we can ascertain, recognized the existence of such a tribe as the Narragansetts; hence they are not a tribe, commerce with which by that clause Congress is empowered to regulate. Neither should we say that, until recognized by the United States, they were a nation, or power, with which treaties could be made; for the first requisite for making a treaty is recognition of the existence of a power with which to make it.

The view of Mr. Justice McLean in *Worcester* v. *Georgia*, that a time must come when from the necessities of the case the action of the States over Indians must be more and more exercised, finds still stronger expression in *United States* v. *Cisna*, 1 McLean, 254, in 1835, where he held that though the federal relations should be withdrawn from the Indians within a State, by the concurrent acts of the federal and State governments, yet if no such act takes place, and the Indians occupy a territory of very limited extent surrounded by a white population, which necessarily has daily intercourse with the

Indians, and it becomes impracticable to enforce the law, the federal jurisdiction must cease. The tendency to relax the extreme view taken earlier in the century, of the exclusive authority of the United States over Indians in the States is also shown in *Elk* v. *Wilkins*, 112 U. S. 94, 107, 108 ; and in *United States* v. *Kagama*, *supra*, already quoted from.

In *State* v. *Newell*, 84 Me. 465, the Supreme Court of Maine, in 1892, held that the Indians resident within that State are not " Indian Tribes " within the treaty-making powers of the federal government ; and that, while they have a partial organization for tenure of property and local affairs, they have now no separate political organization, and are subject as individuals to all the laws of the State. The court, *inter alia*, said : " Whatever the status of the Indian tribes in the west may be, all the Indians of whatever tribe, remaining in Massachusetts and Maine, have always been regarded by those States and by the United States as bound by the laws of the State in which they live. *Danzell* v. *Webquish*, 108 Mass. 133 ; *Murch* v. *Tomer*, 21 Maine, 535. Their position is like that of those Cherokees who remained in North Carolina. It was said of them by the United States Supreme Court, in *Cherokee Trust Funds*, 117 U. S. 288, that they were inhabitants of North Carolina and subject to its laws." " Though those Indians," in Maine, " are still spoken of as the ' Passamaquoddy Tribe,' and perhaps consider themselves a tribe, they have for many years been without a tribal organization in any political sense. They cannot make war or peace ; cannot make treaties ; cannot make laws ; cannot punish crime ; cannot administer even civil justice among themselves. Their political and civil rights can be enforced only in the courts of the State ; what tribal organization they may have is for tenure of property and the holding of privileges under the laws of the State. They are as completely subject to the State as any other inhabitants can be."

In the case of *The Cherokee Trust Funds*, 117 U. S. 288, 309, decided in 1886, and referred to in the Maine case, *supra*, Mr. Justice Field used this language :   " The Cherokees in

North Carolina dissolved their connection with their nation when they refused to accompany the body of it on its removal, and they have had no separate political organization since. Whatever union they have had among themselves has been merely a social or business one. It was formed in 1868, at the suggestion of an officer of the Indian office, for the purpose of enabling them to transact business with the government with greater convenience. Although its articles are drawn in the form of a constitution for a separate civil government, they have never been recognized as a separate nation by the United States ; no treaty has been made with them ; they can pass no laws ; they are citizens of that State and bound by its laws. As well observed by the Court of Claims, in its exhaustive opinion, they have been in some matters, fostered and encouraged by the United States, but never recognized as a nation in whole or in part. 20 C. Cl. 449–483.''

*Danzell* v. *Webquish*, 108 Mass. 133, decided in 1871, was a case under the Massachusetts statute of 1869, cap. 463, which enacted, in § 1, that '' all Indians and people of color, heretofore known and called Indians, within this Commonwealth, are hereby made and declared to be citizens of the Commonwealth, and entitled to all the rights, privileges, and immunities, and subject to the duties and liabilities, to which citizens of this Commonwealth are entitled or subject.'' By § 2, ''all lands heretofore known as Indian lands, and rightfully held by any Indian in severalty, and all such lands which have been or may be set off to any Indian, shall be and become the property of such person and his heirs in fee simple;'' ''and all Indians shall hereafter have the same rights as other citizens to take, hold, convey, and transmit real estate.'' Section 3 (under which said case arose) conferred jurisdiction upon the judge of probate of Plymouth county to make partition of the lands held in common belonging to the Herring Pond Indians, etc. In that case Mr. Justice Gray, on p. 134, said, *inter alia :* '' The remnants of the Indian tribes, residing within the limits of the Commonwealth, having never been recognized by any treaties or ex-

ecutive or legislative acts of the government of the United States as independent political communities, were under the control of the legislature of the State." (Citing cases.) "By the law of Massachusetts, until very recently, these Indians were not subjected to taxation, nor endowed with the ordinary civil and political rights of citizens, but were treated as the wards of the Commonwealth; the title in the lands occupied by their tribes was in the State and could not be alienated by them without the consent of the legislature; and the use and improvement thereof by the Indians was regulated by the legislature from time to time at its discretion, all the earlier allotments being limited to short terms." (Citing cases.) "By recent legislation, the Indians of the Commonwealth have been fully enfranchised from the subjection in which they had heretofore been kept, and put upon the same footing as other citizens, and provision made for the division of their lands among them in severalty as their absolute property. Sts. 1869, c. 463; 1870, cc. 213, 293, 350." See also *Coombs, et al., Petitioners*, 127 Mass. 278, 281; *Drew* v. *Carroll*, 154 Mass. 181, 183.

Finally, although the United States have never recognized the Narragansetts as a tribe of Indians, the State of Rhode Island has recognized them as such, or as a community, or as a something, by whatever name called, which possessed an interest in, or title to, the so-called common tribal lands worthy of compensation when constitutionally parted with; and we think it may be so constitutionally parted with under and by virtue of said cap. 800, amended by cap. 897; and that that interest or title, when acquired by the State, combined with the title the State already had, makes a full and valid title in the State, which it might in turn sell and dispose of in the way and manner provided for in said cap. 800, and give to the purchasers thereof a like full and valid title to said common tribal land. We also think the tribal relations of the so-called Narragansett tribe could be, and were, constitutionally terminated by said cap. 800.

The conclusions to which we have arrived from the foregoing considerations lead us to the opinion that all the ques-

tions put to us by your honorable body must be answered in the affirmative, and we hereby answer them accordingly.

                              CHARLES MATTESON,
                              JOHN H. STINESS,
                              PARDON E. TILLINGHAST,
                              GEORGE A. WILBUR,
                              HORATIO ROGERS,
                              WM. W. DOUGLAS,
                              BENJ. M. BOSWORTH.